SHELBY COUNTY, Tennessee, et al., Petitioners-Respondents,

v.

Erlewood BARDEN and wife et al., Respondents-Petitioners.

Supreme Court of Tennessee.

Sept. 15, 1975.

James M. Manire, William W. Dunlap, Jr., C. Cleveland Drennon, Jr., County Atty., Memphis, for petitioners-respondents.

George T. Lewis, Jr., Joseph A. Heffington, III, Memphis, for respondents-petitioners; Watson, Lewis & Knolton, Memphis, of counsel.

## OPINION

HARBISON, Justice.

These suits were instituted in the Circuit Court of Shelby County, Tennessee by Mr. and Mrs. Erlewood Barden as landowners and White Stone Company, Inc., a corporation, as tenant, for damages by reason of the closing of a county road. Named as defendants were Shelby County, certain of its officials, and the St. Louis-San Francisco Railway Company. The suit was filed on July 9, 1970, within the one-year statute of limitations governing actions by property owners for inverse condemnation as provided in T.C.A. §§ 23–1423, 1424.

There is no dispute as to the material facts. The property of Mr. and Mrs. Barden consists of about twenty acres fronting on Hungerford Road in Shelby County. The landowners acquired this property in 1961, and at the time of the closing of Hungerford Road to the north of their property, they had constructed thereon specially equipped buildings for the conducting of a precast concrete, stone and gravel business, together with paving and other improvements. The premises were leased by the landowners to White Stone Company, Inc., a Tennessee corporation, of which Mr. Barden owned 75% of the stock, with the remaining 25% being owned by one of his business associates. The corporation was the owner of a number of vehicles and a large quantity of special equipment used in the conduct of the corporate business.

By a resolution dated July 10, 1969, the legality of which is not here in issue, the County Commissioners of Shelby County closed Hungerford Road so that the St. Louis-San Francisco Railway Company could build spur tracks across the right-of-way to a new brewery built by the Joseph Schlitz Brewing Company. The railway company entered into an indemnity agreement with the county, to hold the county

harmless on account of any claims for damages arising out of closing of the road.

Separate suits were filed on behalf of the landowners and of the tenant in these cases, claiming damages on the theory that the closing of Hungerford Road deprived the parties of their principal access to U. S. Highway 78 into the City of Memphis. Prior to the closing of the road, the principal traffic flow to the north from the property of the parties was via Hungerford Road to U. S. Highway 78. Hungerford Road was closed about three-tenths of a mile north of the boundary of the property of the plaintiffs, so that it is now necessary for traffic to proceed south on Hungerford Road and thereby through side roads to the west, by a route which intersects U. S. Highway 78 some distance to the south of the original point of intersection. This additional route is described as more circuitous and burdensome than the previous one, and entails an additional distance of between .85 miles and one mile. Mr. Barden testified that it took approximately ten additional minutes each way for a truck driver to make a trip from the plant by this alternate route, or a total of approximately twenty minutes per round trip.

Although initially an issue was made by the defendants below as to the right of the plaintiffs to maintain their action, this issue was ultimately abandoned, and the trial judge submitted to the jury a single issue, without objection from the defendants, that issue being the amount of damages to which the plaintiffs were entitled.

■ Actions by landowners for deprivation or impairment of their rights of ingress and egress on public roads have been long recognized in this state, and there are a large number of reported cases dealing with the subject.[1] Such suits have generally been recognized as inverse condemnation actions; and the theory upon which the actions have been permitted has been that of deprivation or public taking of a property right of a landowner. Procedurally the actions have sometimes been referred to as suits in tort, and the procedures governing the filing of tort actions have been deemed available for this kind of action. See *Scott v. Roane County*, 478 S.W.2d 886 (Tenn. 1972).[2]

The authorizing statute permits a landowner to "petition for a jury of inquest" in which case the action proceeds as nearly as possible as an ordinary condemnation suit. It also provides, however, that in the alternative "he may sue for damages in the ordinary way, in which case the jury shall lay off the land by metes and bounds and assess the damages, as upon the trial of an appeal from the return of a jury of inquest." T.C.A. § 23–1423.

■ Whether initiated by a petition for a jury of inquest, or begun as an ordinary damage suit, it is well settled in the Tennessee cases that the measure of damages to the landowner is that used in condemnation cases.

Thus, in the case of *Brookside Mills, Inc. v. Moulton*, 55 Tenn.App. 643, 651, 404 S.W.2d 258, 262 (1965), a regular condemnation proceeding, it is stated:

"Where the property right taken is the right of access to an abutting street, the measure of damages is the difference in the fair cash market value of the defend-

---

1. See *e. g., Graham v. Hamilton County*, 224 Tenn. 82, 450 S.W.2d 571 (1969); *Sweetwater Valley Memorial Park, Inc. v. City of Sweetwater*, 213 Tenn. 1, 372 S.W.2d 168 (1963); *Stewart v. Sullivan County*, 196 Tenn. 49, 264 S.W.2d 217 (1953); *Morgan County v. Goans*, 138 Tenn. 381, 198 S.W. 69, 5 A.L.R. 198 (1917); *Railroad Co. v. Moriarity*, 135 Tenn. 446, 186 S.W. 1053 (1916); *Hamilton County v. Rape*, 101 Tenn. 222, 47 S.W. 416 (1898); *Speight v. Lock-hart*, 524 S.W.2d 249, 253 (Tenn.App.1975); *Knox County v. Lemarr*, 20 Tenn.App. 258, 97 S.W.2d 659 (1936); *Shelby County v. Dodson*, 13 Tenn.App. 392 (1930).

2. The special one-year statute of limitations, however, is applicable rather than the general statute of three years governing property damage claims. *Central Realty Co. v. Chattanooga*, 169 Tenn. 525, 89 S.W.2d 346 (1936).

ant's property prior to the taking or impairment of the access and its value after the taking and the construction of the project for which the property right was taken. See T.C.A. § 23–1537. The trier of fact, in determining the amount of the award, must be governed by the principle that the owner of the land shall be treated as one offering it for sale, at a fair price, while not being under any stress of circumstances that would induce him to sacrifice his property, and the condemnor as an intending buyer, who is likewise free from stress, as not being forced to buy. *Lewisburg & N. R. Co. v. Hinds*, 134 Tenn. 293, 183 S.W. 985, L.R.A. 1916E, 420. The fact that the property has other access, or is given other access in the course of construction would be a material factor to be taken into consideration in determining the before and after value of defendant's property and, consequently, the value of the access taken."

And, in the case of *Stokely v. Southern Railway Company*, 57 Tenn.App. 271, 279, 418 S.W.2d 255, 260 (1967), an inverse condemnation proceeding, the court said:

"Where the property right taken is the right of access to or over a public street, the measure of damages is the difference in the fair cash market value of the plaintiff's property prior to the taking or impairment of the access and its value after the taking and the construction of the project for which the property right was taken."

In the instant case, the trial judge carefully conducted the trial within the scope of this measure of damages, but the case was complicated by the fact that the property in question was under lease to an operating corporation. At the conclusion of a lengthy trial, the jury awarded the landowners the sum of $33,000.00 for their interest in the property and awarded the lessee the sum of $10,000.00. Both the landowners and the tenant appealed to the Court of Appeals, assigning several errors dealing with the admission and exclusion of evidence.

The Court of Appeals, however, instead of directly responding to these assignments of error, concluded that the trial court had misapplied the measure of damages, and reversed the case for a new trial. The Court of Appeals recognized that ordinarily in cases where the interests of both a landowner and tenant are affected by eminent domain proceedings, the jury must assess the total damages for the taking, and apportion them between the landlord and tenant according to their respective interests. The trial judge so instructed the jury in the present case, but the Court of Appeals reversed, stating that it did not feel that this rule should be applicable where there was no actual taking of property but merely an impairment of access to the property.

The Court of Appeals cited no authority for its holding. It referred to the case of *Gallatin Housing Authority v. Chambers*, 50 Tenn.App. 441, 362 S.W.2d 270 (1962). In that case the court recognized the rule of apportionment but went further to say that the amount of incidental damages to the owner and lessee was not restricted to the market value of the land taken where only part of a tract was condemned.

The court in that case, however, was speaking of incidental damages only, and not the rule used in fixing the value of the basic property right which was taken. In the *Brookside Mills* case, *supra,* the court pointed out that the basic measure to be applied is the value of the right taken, rather than the rules regarding incidental damages. In the trial of that particular action, however, the parties had proceeded upon the theory that loss of access would be treated as an element of incidental damages which could be offset by incidental benefits, and the jury in fact disallowed any recovery for loss of access, holding that it had been more than offset by incidental benefits resulting from the public improvement involved. Since the case had been tried upon that theory, the Court of Appeals correctly declined to permit a change of position on

appeal so as to permit the landowner to claim the before and after value without regard to incidental benefits.

No such problem exists in the present case. The trial judge insisted upon and held the parties strictly to the before and after values involved, and there was no mention of either incidental damages or incidental benefits in his charge to the jury. We do not think that the *Gallatin Housing Authority* case, *supra,* supports the rule announced by the Court of Appeals in the instant case, to the effect that where there is no actual taking of the land, damages to the lessor and to the lessee shall be assessed separately and independently of each other, rather than as a whole.

As stated, the Court of Appeals in the present case ordered a new trial upon the latter theory of damages, and did not respond to the assignments of error made by the original plaintiffs as to the admission or exclusion of evidence by the trial judge.

In the case of *Moulton v. George,* 208 Tenn. 586, 348 S.W.2d 129 (1961), this Court clearly stated that total compensation to be paid for property rights in condemned property must not exceed the unencumbered fee value, and the total compensation must be apportioned between the reversion and the lessee according to their respective interests. This rule has been followed in a number of cases, and the trial judge carefully so instructed the jury in the present case, where the claims of the lessee and of the lessors were consolidated and tried together.

There were no exceptions taken to the charge of the trial judge to the jury, nor were any special requests tendered on behalf of the original plaintiffs. No issue whatever was made in the motion for a new trial or in the appeal to the Court of Appeals as to the correctness of the charge of the trial court. We have scrutinized it carefully, and find that it comports in every respect with the case law of this state. Accordingly we hold that the Court of Appeals was in error in reversing the trial

court on the basis of his instructions, and in suggesting a different measure of damages in cases where there is no actual taking, but merely an impairment of property right, from the rules applied in cases where there is in fact a total or partial taking.

■ The existence of a lease on property or on a property right which has been appropriated for public purposes is, of course, always a complicating factor in the assessment and apportionment of damages. The rules by which leasehold interests are to be valued in this state, however, are well settled and have been clearly stated in a number of cases. The lessee or tenant is entitled to any excess in value of his unexpired leasehold over and above the rentals which would be due for the unexpired term. See *Moulton v. George,* 208 Tenn. 586, 348 S.W.2d 129 (1961); *Mason v. City of Nashville,* 155 Tenn. 256, 291 S.W. 1074 (1927); *State v. Texaco, Inc.,* 49 Tenn.App. 278, 354 S.W.2d 792 (1961).

In the present case the issue was somewhat complicated by the fact that the lessee was a closely held corporation, in which the owner of the fee held 75% of the common stock. The fact that the original plaintiffs recognized that there must be separate awards, however, is clearly demonstrated by the fact that they filed two suits—one for the lessee and a separate one for the owners of the reversion. For convenience, the cases were consolidated for trial and tried together, but they were two separate suits, and there had to be an apportionment of the award between the owners of the separate property interests. At several points during the trial record and on appeal, counsel for the plaintiffs has stated that it was "relatively unimportant" how the damages were awarded since the corporation was largely owned by the reversioners. Further, Mr. Barden testified that the lease which was made between the landowners and the corporation was not an arm's length or negotiated lease, and he stated that the rental had simply been set at a sufficient amount to amortize the mortgage

indebtedness and to pay taxes and other necessary expenses to the owners.

Nevertheless, where parties have deliberately undertaken to do business in corporate form, for tax purposes, accounting and other reasons, they must be held to the corporate form and they cannot shunt aside at their convenience legal entities and the legal aspects thereof.[3] Thus it will simply not do for the landowners to state that they do not really care how damages are apportioned. The law itself requires apportionment between the lessor and the lessee where separate interests are taken or impaired by public improvements, and parties simply must conform their proof to the legal measures of damages prescribed, no matter how artificial or confining these rules may seem to be. The corporate tenant had been deliberately created, and it was paying rent, which it deducted upon its tax returns, and which was reported as income by the landowners. The burden of proof rested upon the corporate tenant to prove the damage to its access right, if any, by competent evidence based upon the difference between the rental required under the lease and the market value of the leasehold. This it made little or no effort to do in any credible or competent fashion. Mr. Barden undertook to testify on direct examination that the corporation held a lease on the property through the year 1989, and he undertook to ascribe a loss of leasehold value to the tenant in excess of $20,000.00 per annum. When the written lease was produced on cross-examination, however, it developed that the lease was only through the year 1980, and that the annual rental had been raised from $2,000.00 per month to $4,000.00 per month after the road closing in question. Indeed, throughout his entire testimony, Mr. Barden did not trouble to support or substantiate the accuracy of his testimony by cost records, profit and loss statements, balance sheets or other records, but contented himself with making the most general estimates. Obviously disappointed with the amount of damages which the jury awarded, both the landowner and the tenant appealed to the Court of Appeals, assigning error as to the rulings of the trial judge on matters of evidence.

The following is a brief summary of the evidence which the jury were permitted to consider. An expert appraiser employed by the plaintiffs testified that in his opinion there had been a total damage or impairment of value to the property of the plaintiffs in the amount of $49,875.00. He did not allocate this between the landlord and tenant. Another expert for the plaintiffs testified that he thought there had been a total depreciation in value in the amount of $64,000.00 by reason of loss of site location and loss of access, due to the closing of the road. Mr. Barden, the only property owner or corporate officer called upon to give an estimate of damages, fixed the leasehold damage at $423,300.00 and damage to the land and buildings in reversion at approximately $189,350.00. An expert witness for the defendants testified that he felt there had been some impairment of value to the property by reason of the closing of the road, and he fixed the amount at $32,500.00. He did state, however, that he felt that 16.9 acres of the total parcel had suffered damage, which he estimated at $2500.00 per acre. A computation of damages, on this basis, would lead to a total of $42,500.00, rather than the lower figure to which he actually testified.

The jury verdict, allowing $33,000.00 to the fee and $10,000.00 to the lease was, therefore, well within the range of the testimony which they were permitted to consider.

The landowners assigned as error in the Court of Appeals and in this Court the fact that the trial judge excluded from jury consideration the indemnity agreement between the St. Louis-San Francisco Railway Company and Shelby County. We are in agreement with the Court of Appeals that

---

3. See *Widdicombe v. McGuire*, 221 Tenn. 601, 607, 429 S.W.2d 815 (1968).

since the only issue to be considered by the jury was one of damages, the indemnity agreement had no probative value and was properly excluded.

■ The landowners further claimed in their assignments of error that the verdict of the jury was contrary to the weight and preponderance of the evidence—an assignment which, of course, cannot be considered by appellate courts in civil cases appealed from a jury verdict.

■ Another assignment of error of the property owners was to the effect that the trial court erred in excluding from consideration by the jury testimony of two witnesses, Roger Maler, and Paul R. Lowry, who purported to offer expert opinion evidence on the depreciation of the buildings. The trial judge, after a full examination of these witnesses in the absence of the jury, concluded that they were not properly qualified and did not have sufficient experience or familiarity with real estate values to permit consideration of their testimony. The trial judge, of course, has very broad discretion in the conduct of a trial, and probably in no area does he have wider discretion than dealing with the qualification and admission of the testimony of expert witnesses. We find no error in his ruling with regard to this testimony. See *Brookside Mills, Inc. v. Moulton*, 55 Tenn. App. 643, 654, 404 S.W.2d 258 (1965).

The fourth assignment of error of the landowners, however, causes us much more concern and is of much more serious import. This is to the effect that the trial judge erred in excluding the testimony of the witness, C. E. Klank, as to impairment of value of the immobile equipment, fixtures and machinery belonging to the tenant. Mr. Barden's general testimony was that this equipment had been paid for by the tenant and belonged to it. There was exhibited in the record what purports to be a copy of the written lease between the tenant and the landowners, but we cannot be sure from the copy exhibited in the record whether all of the terms and provisions of the lease are included in this copy or not. One of the pages, concluding with paragraph 26, appears to be incomplete. The signature portions of the original lease are not included, but only the signatures to an amendment to the lease, executed in 1970. We cannot be sure from the lease, therefore, whether or not the items of equipment and fixtures for which the tenant claimed impairment were removable by the tenant, or whether they became a part of the realty and became property of the landlord upon termination of the lease. We conclude from such testimony as was given on the point and from briefs of counsel that these items belonged to the tenant, and were part of its operating plant equipment.

■ It has been held in this state that a lessee is entitled to compensation for fixtures, structures and other improvements installed or erected by him upon property taken in inverse condemnation cases, if, as against the lessor, he has the right to remove such improvements prior to or upon expiration of the term. See *Hopper v. Davidson County*, 206 Tenn. 393, 333 S.W.2d 917 (1960). Further, in the case of *Yates & Donelson Co. v. City of Memphis*, 137 Tenn. 642, 194 S.W. 903 (1917), in a case involving impairment of access to a street, the Court said:

"It is elementary that damages consequent upon a taking of property or a property right are fixed on the value or depreciation of the property affected for any use for which it would ordinarily sell in the market, whether it be that use to which it is presently put, or some different use to which it is adapted. The structures on the property were built for flouring mill purposes, and were peculiarly suited for that use; and the whole was being operated at the time of the taking, involved in the curtailment or loss of ingress and egress, and was not to be treated as a dead or severed plant.

"We are of opinion that the ruling on testimony and the charge led or left the jury to disregard the fact that the property affected was in actual use by plain-

tiff as a going concern." 137 Tenn. at 647, 194 S.W. at 904.

In that case the Court stated that the determination of whether items were to be considered fixtures or removable was to be reached according to the rules governing vendor and vendee. There was no lease involved in that case.

In the present case Mr. Klank testified that he had appraised the equipment in question for a bank at a period of time after the closing of Hungerford Road. He testified that he had excluded from the equipment list all items which he deemed to be easily removable, and he undertook to express an opinion on depreciation in value of that equipment which he felt either was not removable as a practical matter, or which would be destroyed in the course of moving.

■■■ We are of the opinion that this testimony was competent, and that the trial judge was in error in excluding it from consideration by the jury. The mere fact that there was no actual taking of any of the land or equipment does not exclude the possibility that there may have been a depreciation in its value by reason of loss of accessibility or impairment of ingress or egress. This was precisely the situation in the *Yates* case, *supra*, and the fact that the impairment is claimed by a lessee, rather than the reversioner, does not, in our opinion, alter the rules of evidence laid down in the cases cited above.[4] Such evidence, in our opinion, is admissible, but only insofar as it may reflect upon the leasehold value and its impairment, if any, under the general measure of damages governing leaseholds previously referred to. Its admission should be limited strictly to this purpose; the depreciation in value of the equipment

is not itself recoverable as a separate item of damages. See Annot., 1 A.L.R.2d 878 (1948); 3 A.L.R.2d 286, 302 (1949). See also *Nashville Housing Authority v. Hill*, 497 S.W.2d 917 (Tenn.App.1972).

We cannot say, from an examination of this record that the proffered testimony was merely cumulative, or that its exclusion was harmless error.

■■■ The remaining assignment of error made by the landowners in the Court of Appeals and in this Court was to the effect that the trial court erred in excluding from consideration by the jury certain evidence as to profits and losses of the tenant in the operation of its business. The trial court did not, in fact, entirely exclude this type of testimony from consideration of the jury. He simply ruled that it would be limited in scope to approximately one year prior to the taking and to approximately one and one-half years subsequent to the taking. We cannot find in our examination of the record at any point where counsel for the plaintiffs actually put before the jury the figures which the trial judge, in his rulings, had permitted. Mr. Barden testified generally that the business had shown a profit every year through the year of the closing of the road, and in an offer of proof, made in the absence of the jury, he summarized some profit and loss statements which had been filed as exhibits to discovery proceedings, indicating a very high profit in the year 1970, and substantial losses in the years thereafter.

Again, however, we must emphasize the generality and lack of documentation of Mr. Barden's testimony. He undertook to state generally that it would cost the tenant about $42,500.00 per year in extra wages of drivers, fuel and operating costs of vehicles,

---

4. Apparently the trial judge applied the rule which obtains in housing authority and some other direct condemnation proceedings to the effect that a condemnor may not acquire personal property under eminent domain, and that the property owner can recover only items of moving expense in connection with personalty. See *Memphis*

*Housing Authority v. Memphis Steam Laundry-Cleaners, Inc.*, 225 Tenn. 46, 463 S.W.2d 677 (1971). This limitation, as pointed out in the *Hopper* and *Yates & Donelson* cases, does not apply to inverse condemnation cases. See also *Zirkle v. City of Kingston*, 217 Tenn. 210, 220, 396 S.W.2d 356 (1965).

to drive the additional one mile entailed by the closing of Hungerford Road. At no point, however, did he purport to offer in evidence his actual cost figures for any period of time either before or subsequent to the closing of the road. These must have been available to him, at least for the year 1970, and the trial court had ruled that he would permit the jury to consider operating figures through the end of the year 1970.

We find no abuse of discretion by the trial judge in his ruling on this item.

In the case of *L & N Turnpike Co. v. Creveling*, 159 Tenn. 147, 160, 17 S.W.2d 22, 26 (1928):

"While we hold that net income, present or prospective, is not controlling, evidence thereof is altogether competent; the weight to be given such evidence as may be adduced being for the jury, in connection with all other material evidence."

See also *State v. Rascoe*, 181 Tenn. 43, 49, 178 S.W.2d 392 (1944).

Mr. Barden testified that many factors entered into the losses and financial difficulties which his firm encountered in the years subsequent to 1970. He also testified that another access road was made available to his company some three years after the closing of Hungerford Road. Under all of the circumstances, therefore, we think the trial judge correctly limited the proffered evidence of profits and losses to a period of time relatively close to the date of the closing of the road, and this assignment of error is overruled.

From the foregoing, we are of the opinion that the case must be remanded to the trial court for a new trial, in accordance with the rules of evidence and damages hereinabove set forth.

All costs incident to the appeal of this case will be divided equally between the parties. Costs in the trial court will abide the result there.

FONES, C. J., and COOPER, BROCK and HENRY, JJ., concur.