# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
March 4, 2002 Session

## ELAINE WYNN v. DR. JOSEPH HAMES

**A Direct Appeal from the Circuit Court for Benton County**
**No. 99CCV-271      The Honorable Julian P. Guinn, Judge**

_____

**No. W2001-00269-COA-R3-CV - Filed May 13, 2002**

_____

This a medical malpractice case. Plaintiff's decedent saw Defendant, an emergency room physician, who diagnosed decedent with pneumonia and sent decedent home with antibiotics. Plaintiff's decedent died the next day from congestive heart failure. Plaintiff, wife of decedent, sued Defendant for malpractice. The jury's verdict found decedent 90% at fault and Defendant 10% at fault, and the trial court entered judgment for Defendant on the jury verdict. Plaintiff appeals. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which DAVID R. FARMER, J. and D'ARMY BAILEY, SP. J., joined.

T. Robert Hill, Randall J. Phillips, Jackson, for Appellant, Elaine Wynn

Jerry D. Kizer, Jr., Patrick W. Rogers, Jackson, for Appellee, Dr. Joseph Hames

## OPINION

This medical malpractice case arises out of the death of James Wynn ("decedent" or "Mr. Wynn") from congestive heart failure. Mr. Wynn, a 53 year-old man with a history of diabetes and hypertension[1], went to the Camden General Hospital emergency room complaining of a cough which had lasted several days, chest pain and trouble breathing. Mr. Wynn told the treating physician, Defendant Joseph Hames ("Dr. Hames"), the he had come down with a cold a few days before and that the cold had moved from his head to his chest. Mr. Wynn was running a temperature of 99.9 degrees, his heart rate was regular, and his lungs revealed sounds suggesting a lower respiratory infection. Mr. Wynn specifically denied that he had or was experiencing crushing, or external chest

---

[1]The record also indicates that Mr. Wynn was obese.

pain or pain radiating to his neck and arm. Dr. Hames ordered a chest x-ray, which Dr. Hames testified was not consistent with congestive heart failure but, rather, with what is commonly referred to as "walking pneumonia."[2]

Plaintiff, Elaine Wynn, Mr. Wynn's wife, testified that her husband's condition was about the same that evening and the next morning. She testified that the two of them had played cards together the evening following her husband's visit to the emergency room, and that when she left her husband in the morning to go to work, there was nothing unusual in his condition. Mrs. Wynn also testified that when she spoke to him by telephone around noon, she had difficulty understanding what he was saying because he sounded "very congested and froggy." She believes he told her he had fallen.

After calling home, Mrs. Wynn left work immediately to check on her husband. When Mrs. Wynn arrived home, Mr. Wynn's voice was clearer, and Mrs. Wynn testified that she thought her husband had gotten up too quickly and lost his balance. Mrs. Wynn tried to contact her husband's regular physician, and even called the pharmacy that dispensed the medicine in an attempt to locate Dr. Hames phone number. Later, she asked her husband whether he thought he should go back to the doctor, but Mr. Wynn said that Dr. Hames had told him that it would take a few days for the medicine to have any noticeable effect and that he wanted to rest. Several hours later, Mr. Wynn began to have serious difficulty breathing, and Mrs. Wynn called 911. The paramedics took Mr. Wynn to the hospital, and he was pronounced dead shortly after.

Mrs. Wynn filed this action on October 13, 1999 against Dr. Hames, Camden General Hospital, Chris Tubbs (an emergency room nurse), and Pam Layton (the Emergency Room Supervisor). Mrs. Wynn amended her Complaint on January 3, 2000, adding Jackson-Madison County General Hospital District as a defendant. On June 5, 2000, the court entered a consent order granting summary judgment in favor of Defendants Tubbs and Layton. On June 30, 2000, the trial court entered an order granting summary judgment in favor of Defendants Jackson-Madison County General Hospital District and Camden General Hospital, Inc.

At the conclusion of the jury trial in this matter, the jury returned a verdict finding Dr. Hames 10% at fault and Mr. Wynn, the decedent, 90% at fault, and judgment for Defendant was entered thereon. Mrs. Wynn filed a Motion for a New Trial, which the trial court denied by order entered January 26, 2001.

Mrs. Wynn appeals and presents the following two issues for review: (1) Whether the trial court erred in denying Plaintiff's Motion for a Directed Verdict as to the affirmative defense of

[2]Dr. Hames testified that, an x-ray taken of a patient with congestive heart failure would show an enlarged heart and "haziness" on both of the patient's lungs. In this case, however, Dr. Hames testified that the x-ray revealed that Mr. Wynn's heart was not enlarged, and that the "haziness" was only present in one lung: all consistent with a diagnosis of "atypical" or "walking" pneumonia.

comparative fault and instructing the jury regarding the negligence of the decedent; and (2) Whether the trial court erred in denying Plaintiff's Motion to Strike the expert testimony of Dr. Scott Portis. We will now consider the first issue.

When deciding a motion for a directed verdict, both the trial court and the reviewing court on appeal must look to all the evidence, take the strongest legitimate view of the evidence in favor of the opponent of the motion, and allow all reasonable inferences in favor of that party. The court must discard all countervailing evidence, and if there is then any dispute as to any material fact, or any doubt as to the conclusions to be drawn from the whole evidence, the motion must be denied. *See Conatser v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 647 (Tenn. 1995); *Hurley v. Tennessee Farmers Mut. Ins. Co.*, 922 S.W.2d 887, 891 (Tenn. Ct. App. 1995). A directed verdict cannot be sustained if there is material evidence in the record which would support a verdict for the defendant under any of the theories the defendant had advanced. *Id.*; *Conatser*, 920 S.W.2d at 647.

Plaintiff's argument for a direct verdict in the trial court was premised solely on the alleged failure of proof of negligence on the part of Plaintiff's decedent. The trial transcript reveals the following exchange:

> THE COURT:   Anything else you want on the record at this time, sir?
>
> MR. HILL:   Yes, your honor. We believe that the defense that was raised by answer and in the opening statement of comparative fault on the part of Mr. Wynn is not supported by the evidence, and therefore, we respectfully move the court for a directed verdict on the issue of comparative fault on the grounds that, one, there was no negligence proven and no breach of any duty proven, and therefore, a defense of comparative fault falls as a result of lack of proof.
>
> THE COURT:   All right. Let your motion be overruled.

On appeal, Plaintiff argues at great length that Defendant failed to properly raise in his pleadings the affirmative defense of comparative negligence. It appears that Plaintiff, therefore, raises a theory on appeal different from the theory asserted in the trial court. It is well settled in this state that a party on appeal will not be permitted to depart from the theory on which the case was tried in the lower court. Issues not raised or complained of in the trial court will not be considered on appeal. *See Tamco Supply v. Pollard*, 37 S.W.3d 905, 909 (Tenn. Ct. App. 2000). Nevertheless, we will briefly discuss this waived theory in conjunction with our discussion of the Plaintiff's theory advanced in the trial court.

We begin our analysis by noting that Rule 8.03 of the Tennessee Rules of Civil Procedure provides, in part, "In pleading to a preceding pleading, a party shall set forth affirmatively facts in short and plain terms relied upon to constitute. . .comparative fault. (including the identity or description of any other alleged tortfeasors). . ." Tenn. R. Civ. Pro. 8.03 (2001). This rule contemplates that a defendant must give a plaintiff sufficient notice as to the existence and identity of a comparative tortfeasor so as to allow the plaintiff to initiate discovery. *See, e.g., Brown v. Wal-Mart Discount Cities*, 12 S.W.3d 785, 787 (Tenn. 2000); *George v. Alexander*, 931 S.W.2d 517, 521-22 (Tenn. 1996).

With this in mind, we review the record in this case. The Defendants filed an answer which set forth a general comparative fault defense and included the language, "the damages, if any, recoverable in this action must be diminished or apportioned to the fault attributable to all persons and entities contributing thereto." Following Mrs. Wynn's deposition in this case, Dr. Hames, pursuant to a consent order, filed an Amended Answer in which he sets out the following defense:

> Defendant asserts that James Wynn was himself guilty of negligent acts or omissions which proximately cause and contributed to his death. Defendant asserts that Mr. Wynn's proximate comparative negligence, being greater than one-half of the cause of the harm, bars any recovery. In the alternative, Defendant asserts that, if the facts developed during trial support the theory that Mr. Wynn's comparative negligence was less than half the total negligence involved in his death, Plaintiff's recovery should be reduced proportionally with Mr. Wynn's comparative negligence.

At trial, defense counsel raised the comparative fault of Mr. Wynn on numerous occasions, the most significant of which was upon cross examination of Mrs. Wynn:

> Mr. Kizer:  And I believe you said that Wednesday morning when you left for work the day that Mr. Wynn died, he was in the recliner and he seemed to be sleeping fine; is that right? You didn't notice anything unusual about him?
>
> Mrs. Wynn:  No, sir, not anything from the previous couple of days.
>
> Mr. Kizer:  And you called him from work at noon, as I understand? Around noon, your lunch hour; is that right?
>
> Mrs. Wynn:  Yes.

*   *   *

Mr. Kizer:     And you said he sounded like he was difficult to understand, he sounded like he had lost his balance or something; is that right?

Mrs. Wynn:     He sounded like he had a frog in his throat, and I couldn't discern what he said.

Mr. Kizer:     And at that time you told Mr. Wynn to go to the doctor, didn't you?

Mrs. Wynn:     No.  I told him to go to the recliner.

Mr. Kizer:     Well, I may have misunderstood in your deposition - -
                           *   *   *

Mr. Kizer:     I'll refer you to page 61, line 17.  The question was, "Okay.  What did you find when you arrived?"

        Answer:  "I talked to him to understand what happened.  He said he had gotten up and gone to the rest room.  He was coming out and kind of lost his balance.". . .

        Question on page 62, line 1: "Okay.  What else was said or done at that point?"

        Answer: "I told him that he needed to go back to the doctor."

Mrs. Wynn:     I may have suggested to him that he should, but he said that he didn't need to go, he just had a dizzy spell.

Mr. Kizer:     Well, as soon as you got home, though, you told him that he needed to go back to the doctor?

Mrs. Wynn:     Well, I though he did, and I asked him several times.  He gave the same answer every time.  One of the things that he told me was that the box on the front of the form that was not marked said to come back if you have any problems, and he didn't anticipate there would by any, and that was why he didn't go back.

Mr. Kizer:     But you felt like he needed to go back to the doctor; is that right?

Mrs. Wynn:     I'm the worrier.  When it came to my husband, I worried a lot.

*   *   *

Mr. Kizer:     And you said you started trying to call Dr. Goad?

Mrs. Wynn:     Not initially.  I thought about it for a while and I decided I wanted to.

Mr. Kizer:     And you thought about the emergency room and suggested that he go back to the emergency room; isn't that right?

Mrs. Wynn:     I would have preferred that he go see our regular family doctor.  She was familiar with him.

Mr. Kizer:     But he refused to go back to the emergency room, did he not?

Mrs. Wynn:     He said he didn't feel any worse than he did before. He said that he was told it would take time for the medicine.

At no time during this exchange did counsel for Mrs. Wynn object as to defense counsel's line of questioning.  Similarly, we find nothing in the record, apart from Mrs. Wynn's Motion for a Directed Verdict, which indicates that Mrs. Wynn's counsel objected to the presentation of evidence regarding Mr. Wynn's comparative fault in this case.  Rule 15.02 of the Tennessee Rules of Civil Procedure provides:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.  Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment;  but failure so to amend does not affect the result of the trial of these issues.  Provided, however, amendment after verdict so as to increase the amount sued for in the action shall not be permitted.  If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice that party in maintaining

the action or defense upon the merits. The court may grant a
continuance to enable the objecting party to meet such evidence.

Should Defendant's amendment to his answer be deemed insufficient to raise the issue of the decedent's fault, Rule 15.02 cures the problem.

We next address Mrs. Wynn's contention that there is insufficient evidence in the record to support the defense of comparative fault on the part of Mr. Wynn. Under the standard of review cited above, we must affirm if there is material evidence in the record which would support Dr. Hames's theory of comparative fault.

As we have noted above, the record contains testimony which supports a finding of comparative fault. Mrs. Wynn testified that she was concerned enough about her husband's well-being that she left work to go home to check on him. She also testified that she tried on several occasions to contact Mr. Wynn's regular physician, and even called the pharmacy at one point in an effort to contact Dr. Hames directly. The testimony reproduced above also reveals that Mrs. Wynn, at least on several occasions, asked her husband to go back to the emergency room, but he refused. Although Mrs. Wynn relies on emergency room discharge instructions Mr. Wynn received which indicated that he should not be surprised if it took a few days before he felt better, we cannot agree that it was reasonable for Mr. Wynn to delay returning to the emergency room when his condition had worsened significantly. Moreover, there is testimony that had he returned to the emergency room, the outcome would have likely been different.

We believe this evidence is sufficient to support the defense of comparative fault on Mr. Wynn's part. On this record, it appears reasonable for a jury to reach the conclusion that Mr. Wynn's inaction in seeking medical treatment was a significant cause of his death.

The second issue Mrs. Wynn presents is whether the trial court erred in allowing Dr. Scott Portis to testify on behalf of Dr. Hames. At trial, counsel for Mrs. Wynn moved to have Dr. Portis's evidentiary deposition stricken because Dr. Portis allegedly did not comply with the provisions of T.C.A. § 29-26-115 as it pertains to expert medical testimony.[1]

---

[1]T.C.A. § 29-26-115 provides, in relevant part:

> (a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):
>     (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which he practices or in a similar community at the time the alleged injury or wrongful action occurred;
>     (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
>     (3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

(continued...)

-7-

To begin with, we note that the party introducing expert testimony in a medical malpractice action carries the burden of proof as to the statutory requirement that medical experts practice in a community similar to the one in which the claim arose. *See Mabon v. Jackson-Madison County Gen. Hosp.*, 968 S.W.2d 826, 828 (Tenn. Ct. App. 1997). Although this Court has "admonished lawyers to couch their medical experts' conclusions in the language of" the statute, we realize that "a mere ritualistic incantation of statutory buzz words evidences very little." *Church v. Perales*, 39 S.W.3d 149, 166 (Tenn. Ct. App. 2000). Rather, we must look at the expert's opinion to determine if it is based upon "trustworthy facts or data sufficient to provide some basis for the opinion." *Id.* We must, therefore, examine the record for evidence that Dr. Portis was qualified to testify as to the recognized standard of acceptable professional practice required of an emergency room physician in Camden, Benton County, Tennessee, or a similar community, in 1999.

The trial court is vested with broad discretion to determine the "admissibility, qualifications, relevancy and competency of expert testimony." *McDaniel v. CSX Transp.,* 955 S.W.2d 257, 263 (Tenn. 1997). *See Shelby County v. Barden*, 527 S.W.2d 124, 131 (Tenn. 1975)*; Mabon*, 968 S.W.2d at 829. The trial court's rulings in this regard will be upheld except upon a showing of an abuse of this discretion. *See McDaniel*, 955 S.W.2d. at 263-64.

Plaintiff asserts that Dr. Portis could not define the "standard of care" and, thus, was not qualified to testify concerning the standard of care required of physicians in the community. Dr. Portis testified as to the definition of standard of care: "I think the standard of care in a certain area would be what I and the majority of my ER physicians in this area would do in a specific case." Plaintiff relies upon the decision of this Court in *Hopper v. Tabor*, 1998 WL 498211, No. CA03A01-9801-CV-00049 (Tenn. Ct. App. 1998). In *Hopper*, the plaintiff submitted the testimony of a Dr. Oldham in opposition to a summary judgment motion by the defendant-physician. Dr. Oldham testified concerning his understanding of the standard of care as follows:

> Q. What is your understanding as far as your testimony is concerned of what standard of care means?
>
> A. Well, to me, standard of care means doing those things which a majority of physicians in a community would consider to be reasonable medical care in that community.

---

[1](...continued)

(b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred.

Dr. Oldham further testified that he could not be "be precise" about his awareness of the standard of care in the community where the alleged malpractice occurred.

In Dr. Portis's deposition, he testified he was familiar with the standard of care for an emergency room physician in Camden, Tennessee, or a similar community, on the date in question. Dr. Portis also testified as to his extensive knowledge throughout the region concerning the practice of emergency room physicians and although his answer as to the definition of the standard of care is somewhat inartful, it could be interpreted to be what a reasonable medical practitioner in a same or similar community would have done in a particular case. The trial court apparently considered it in that manner, and we find no abuse of discretion in the admission of the testimony. In any event, we note, considering the testimony of Dr. Hames, Dr. Geno, Dr. Garrett, and Dr. Sentell, that there is material evidence to support the verdict of the jury and the court's judgment thereon. If there were any error on the part of the trial court in admitting Dr. Portis's deposition, it was harmless error.

Accordingly, the judgment of the trial court is affirmed. The case is remanded to the trial court for such further proceedings as may be necessary. Costs of the appeal are assessed to appellant, Elaine Wynn, and her surety.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.