IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
September 19, 2002 Session

## IN THE MATTER OF: R.C.V. and O.V., CHILDREN UNDER THE AGE OF 18 YEARS

**A Direct Appeal from the Juvenile Court for Shelby County**
**No. J2905      The Honorable George Blancett, Special Judge**

---

**No. W2001-02102-COA-R3-JV - Filed November 18, 2002**

---

This is a termination of parental rights case on appeal for the second time. This Court in the first appeal reversed the order of the juvenile court terminating the parental rights of the parties primarily because the trial court failed to provide counsel to the parties pursuant to Rule 39, Tenn. R. Juv. P. On remand, the juvenile court found clear and convincing evidence justifying termination of parental rights pursuant to the applicable statutes and that termination was in the children's best interests. The juvenile court also held that the appointment of a special judge in this instance was not unconstitutional nor was the parent denied due process in the termination proceeding. As appealed, we affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which DAVID R. FARMER, J. and HOLLY KIRBY LILLARD, J., joined.

Webb A. Brewer, Barbaralette G. Davis, Nancy Percer Kessler, Memphis Area Legal Services, Inc., For Appellant, Cynthia Valle

Paul G. Summers, Attorney General and Reporter, Douglas Earl Dimond, Assistant Attorney General, ForAppellee, Tennessee Department of Childrne's Services

**OPINION**

The parents of the two children, O. V. and R. V., are Gilberto and Cynthia Valle. O. V. was born on May 11, 1995. On June 6, 1995, O. V. was found to be dependent and neglected and placed in the custody of the Tennessee Department of Children's Services (DCS). R. V. was born on July 6, 1996, and on July 9, 1996, she was placed in DCS custody as a dependent and neglected child. Both children were placed in foster care, and court approved plans were adopted for both with the goal of reunification of the family. On March 4, 1997, Court Appointed Special Advocate (CASA)

was appointed after DCS recommended that the children stay in foster care. On February 20, 1998, CASA filed a petition for termination of parental rights pursuant to T.C.A.§ 36-1-113(c) alleging that: (1) the children had been abandoned pursuant to T.C.A. § 36-1-113(g)(1) as defined in T.C.A. § 36-1-102; (2) pursuant to T.C.A. §§ 36-1-113(g)(2) and 37-2-403 appellants failed to substantially comply with the plans of care; (3) pursuant to T.C.A. § 36-1-113(g)(3)(A)(I-iii) the children were removed from appellants' home by court order for a period of six months, and that the conditions that led to removal persist with little likelihood of an early remedy; and (4) that termination was in the best interest of the children. The case was heard on May 28, 1998, by Special Judge George Blancett. At the conclusion of all proof, the trial court ruled from the bench that the parental rights of Gilberto and Cynthia Valle would be terminated. The order terminating parental rights was entered June 24, 1998. On Appeal, this Court reversed the order of the trial court and remanded the case for a second trial. Our decision was based primarily on the trial court's failure to inform the father, Gilberto Valle, of his right to an attorney. *See In re Valle,* 31 S.W.3d 566 (Tenn. Ct. App. 2000).

Before the second trial, the children's father, Gilberto Valle, died. Since his death, the mother, Cynthia Valle ("Ms. Valle," or "Appellant"), has proceeded on this matter alone. Prior to the second trial, a supplemental report and recommendation was filed by the court-appointed *guardian ad litem*.[1] In preparing the supplemental report, the *guardian ad litem* reviewed the records of the Juvenile Court and the DCS, discussed the case with Ms. Valle, and visited with the children.[2] After these interviews, the *guardian ad litem* renewed his previous finding that "the mother appears to care and want custody of the children, but [she does] not seem to be in a position to take care of the minor children or to provide a suitable residence for her or her children." The *guardian ad litem* recommended that custody remain with DCS and that Ms. Valle's parental rights be terminated.

The second trial took place in the Juvenile Court of Memphis and Shelby County before Special Judge George Blancett on June 7, 2001. At the outset of the trial, Memphis Area Legal Services (MALS), who represented Ms. Valle, objected to Special Judge Blancett hearing the case. MALS argued that Special Judge Blancett's appointment was not consistent with Rule 11 of the Tennessee Supreme Court or, alternatively, that T.C.A. § 17-2-118(f) was unconstitutional. The juvenile court overruled MALS' objection and the case proceeded.[3]

---

[1] Before the first trial, Judge McDowell agreed that an attorney should be appointed to represent Ms. Valle due to her history of mental illness and that a *guardian ad litem* was needed to represent the needs of the children. On April 29, 1998, orders were entered appointing an *attorney ad litem* to protect the lawful rights of Ms. Valle and a *guardian ad litem* was appointed for the protection of the children's rights.

[2] At the time of the interview, R. V. and O. V. were living with foster parents. The *guardian ad litem* was "very impressed with the conditions of the children and equally impressed with the fact that the children have a stable home...." At the time of the interview, Ms. Valle was living at 1373 Faxon, a boarding house. The *guardian ad litem* described the environment as "unstable."

[3] An Order was entered on June 7, 2001, stating that:

(continued...)

Ms. Marie Brunt, a case manger in adoption for the DCS, testified on behalf of CASA, using notes of events in the case file of DCS. Ms. Brunt was assigned to the Valle case in February of 2000.[4]

Ms. Brunt testified that both O. V. and R. V. came to the attention of DCS shortly after their respective births when the hospital contacted DCS to express concern about releasing the children to Ms. Valle due to her mental condition.[5] Both children were taken directly from the hospital into protective services.[6] Neither child has been returned to the mother since being taken into state custody. According to DCS' policy, a plan was approved for O. V. on July 7, 1995 and a plan for R. V. was approved on August 8, 1996. The goal of the original plan was reunification of the family.

The original plans listed three requirements for Ms. Valle: (1) to seek and complete mental health treatment, (2) to attend parenting classes, (3) to contact DCS for visitation with her children. A fourth requirement that Ms. Valle sign a release so that DCS could obtain her mental health records was added in a subsequent review of the plan. DCS referred Ms. Valle to The University of Tennessee for parenting classes, beginning in July 1996. On August 8, 1996, DCS received a letter discharging Ms. Valle from the parenting class because "[Ms. Valle's] mental illness is preventing her from learning appropriate parenting skills."[7] After Ms. Valle was dismissed from the UT parenting class, DCS enrolled her in another class at the Parenting Center. Ms. Valle failed to attend the Parenting Center class.[8] Despite DCS' requests, Ms. Valle also failed to provide proof

---

[3](...continued)
Upon careful consideration of the trial memoranda filed by the Respondent and the Attorney General and the arguments of counsel, and in light of the recent decision of the Court of Appeals in *In re Valentine*, No. W1999-01293-COA-R3-CV, 2001 WL 277979 (Tenn. Ct. App. WS march 19, 2001), the Court is of the opinion that the Respondent's challenge is not well-taken and that the Referee is authorized to hear this case. It is so ORDERED.

[4] Ms. Fannie Lamar was the previous case manager. She testified on behalf of CASA at the first trial in May of 1998.

[5] The exact nature of Ms. Valle's mental illness is not in record.

[6] The protective order for O. V. was signed on 6/6/95 and the order for R. V. was signed on 7/9/96.

[7] This letter was from Alison M. Lozano, the Chief of Social Work for UT. Ms. Lozano indicated that Ms. Valle "monopolized the class talking about issues that had nothing to do with the class discussion." Furthermore, Ms. Valle got into a verbal altercation with another member of the class and then refused to let the matter end.

[8] On cross-examination, Ms. Valle's attorney questioned Ms. Brunt as to whether DCS provided a referral to a parenting class specializing in parents with mental illnesses. Ms. Brunt answered that DCS did not. Also, Ms. Brunt admitted that she was not sure whether Ms. Valle received a copy of the enrollment letter from the Parenting Center. Ms. Valle testified that she was never notified of her enrollment in the Parenting Center Class and that she was under the impression that DCS did not want her to attend any more parenting classes after the incident at UT.

that she was complying with her medication regime for treatment of her mental illness.[9]  Ms. Valle also failed to maintain contact with DCS regarding her children and her visitation.  According to Ms. Brunt, Ms. Valle also failed to satisfy the fourth requirement by signing a release in order for DCS to be informed of the progress of her treatment for mental illness.  According to Ms. Valle's testimony, she does not recall having been asked to sign a release.

Regarding visitation, Ms. Brunt testified that Ms. Valle visited once in 1995, nine times in 1996.  The 1995 and 1996 visits were uneventful, except for the fact that Ms. Valle often left early.[10]  There were two visits in 1997.  During the 1997 visits, Ms. Brunt testified that Ms. Valle's behavior became "aggressive and hostile," and that security was called to escort her from the building.  After March of 1997, Ms. Valle made no further attempts to visit with her children.[11]  In 2001, following a hearing in March, a new visitation schedule was set up for Ms. Valle.  Since that time, she has had three visits with her children, all of which went well.[12]  During these visits, Ms. Valle was accompanied by her sister, Leatrice Townsend, and her mother.  Ms. Townsend testified that she had called Ms. Fannie Lamar at DCS at least twice to request that she [Ms. Townsend] be allowed to see the children independent of whether Ms. Valle was there and was told that such visitation was impossible if the parent was not present.   Ms. Brunt testified that DCS has made every effort to accommodate Ms. Valle's requests for visitation with the children; however, due to illness, one or two visits were denied.[13]

As to monetary support, Ms. Brunt testified that Ms. Valle has never provided money for the care of her children.   Ms. Valle testified that her monthly income was $457 from SSI.  On August 5, 1997, the goal of the plan was changed from family reunification to adoption.  Ms. Brunt testified

---

[9] Ms. Valle testified that, at the time the initial plan for O. V. was drafted, she was receiving treatment for her mental illness at St. Joseph under the supervision of a Dr. Rao.  However, according to her own testimony, she did not remember giving this information to DCS.  When St. Joseph's Hospital closed, Dr. Rao referred Ms. Valle to Midtown Mental Health Center for continuation of her treatment.  Ms. Valle was treated with medication, including Lithium.  Ms. Valle's most recent visit to Midtown Mental Health Center was one month prior to the second trial.  Although Ms. Valle produced some medical records for the second trial, these records did not include any period before May of 1998.

[10] R. V. was not born until July 6, 1996 so the 1995 visit and approximately half of the 1996 visits were only with O. V.

[11] Ms. Valle was incarcerated during part of 1998.  She made no attempts to see her children during this period, although there is some indication in the record that she tried to visit after she was released.  Ms. Valle testified that she contacted DCS concerning a visit approximately two weeks after she was released from prison on April 8, 1998.  There is also some confusion in Ms. Brunt's testimony as to whether there was a visit before the first trial sometime in April or May of 1998.

[12] These visits occurred on April 26, May 9, and May 24 of 2001.  Ms. Brunt testified that Ms. Valle arrived on time and was attentive to her children.  However, the children did not recognize Ms. Valle as their mother but only as a "lady they were coming to visit."

[13] O. V. has a heart condition–a "rapid heart condition," according to Ms. Brunt, which has resulted in hospitalization.  O. V. is required to take medication three times per day for his condition.  R. V. is an asthmatic and also takes medication for that condition.

that the reason for the change was due to Ms. Valle's failure to comply with the plan of care and the DCS' belief, based on the mother's past history, that the failure to comply would not be remedied in the future.

As to possible family member adoption of the children, Ms. Townsend and Ms. Valle both testified that the family discussed the possibility of one of them adopting the children and decided that Ms. Valle's aunt, Ann Harris, should pursue this possibility. Ms. Brunt of DCS testified that, although Ms. Harris initiated the adoption process, she failed to satisfy all of the procedural requirements. Ms. Townsend testified that, after Ms. Valle's parental rights were terminated after the first trial, she [Ms. Townsend] also inquired about adopting the children. Ms. Townsend did not, however, follow through because it was her understanding that a termination of Ms. Valle's rights also precluded the family from pursuing adoption or other association with the children.

At the close of Ms. Brunt's testimony, CASA rested their case. At that point, Ms. Valle's attorney moved to have the petition for termination of parental rights dismissed on the basis that CASA had not met their burden by clear and convincing evidence. The motion was denied.

Ms. Valle subsequently testified that she was currently living in a "group home," and that she would not be able to care for her children unless she "had some help." When asked what type of help she would require in order to be able to care for her children, Ms. Valle responded that she would need help with housing, transportation, and money.

At the close of all evidence, the trial court took the matter under advisement. An order terminating Ms. Valle's parental rights was entered on July 12, 2001, and provides in pertinent part:

FINDINGS OF FACT

This matter came on to be heard before the Honorable George E. Blancett, Special Judge of the Juvenile Court of Memphis and Shelby County, Tennessee; appointed pursuant to Tennessee Code Annotated Section 17-2-118(f)(2), the Judge having found it necessary to be absent from holding court...

\*                              \*                              \*

From the testimony at this hearing it appears that the mother has an undefined "mental disability." No evidence or testimony as to the nature of such mental illness was tendered to the Court. The mother's condition appears to have been known by the Tennessee Department of Children's Services prior to [O.V.] coming into their custody due to two other children having been removed from her custody. The Tennessee Department of Children's Services had no contact with the mother due to her whereabouts being unknown to the Tennessee

-5-

Department of Children's Services at the "staffing" for the first Plan of Care. The mother, in her absence, was assigned the responsibility, among other things, to seek and complete treatment for her mental illness. The Plan's initial goal was for return of said child to the mother; the Plan also expressed the alternative to make placement with a family member if one were available.... The mother maintain [sic] little contact with the Tennessee Department of Children's Services during 1995, and the first record of her contact with the Tennessee Department of Children's Services was in December 1995, at which time the contents of the Plan were explained to her, and she had her first visit with [O. V.] since his removal from her.

There was no evidence offered of any additional contact between the mother and child until after the mother gave birth to [R. V.] on July 6, 1996, at which time the hospital, being aware of the condition of the mother, contacted the Tennessee Department of Children's Services concerning the possible risk of harm to said child if discharged to her mother. The hospital was aware that three other children had been previously removed from the mother's custody. [O. V. and R. V.] were placed in the same foster home and separate plans of care were prepared for each of them. The mother was present at the "staffing" for the first Plan for [R. V.] on July 29, 1996.... The Plan...required the mother and father to attend "parenting classes" and for the mother to sign a release to enable the Tennessee Department of Children's Services to be informed of the nature of her mental illness and what, if any, progress and treatment was being rendered. There is no record of receiving this information and no evidence of a release of information being signed or its being tendered to her for signing other than notations in the Plan.

Both parents were referred to The University of Tennessee, Boling Center for Developmental Disabilities to attend "Supported Parenting Classes" from which the mother was dismissed in August 1996, due to her inappropriate behavior. ... The parents were later, in December 1996, referred to The Parenting Center to attend parenting classes;. . . . there is no evidence that they complied or attended any of the classes. Several plans of care ... were prepared to guide the family and the Tennessee Department of Children's Services in attempts to reunite this family. The Tennessee Department of children's Services worker assigned to this case in February 2000, testified from the records of the efforts of the previous case managers. The records show that there has been continued noncompliance with the plan of care by the mother.

The testimony further shows that the visitation of the mother with the children has been irregular. In the year 1995, the mother visited with O. V. only once, December 8, 1995. In 1996, the mother visited with the children nine times. The written notes recorded during the visits described the mother as being inattentive to the children, her leaving early before the scheduled time for the visit was to end, and of a lack of bonding between mother and children. In 1997 two visits were recorded, the second of these visits was at the Tennessee Department of Children's Services offices at which time the mother's conduct became so aggressive and hostile that she was removed form the building by the building security staff.

The mother did not request visitation again until after the petition to terminate her parent rights was filed in 1998. The mother next requested visitation following the remand of this matter for a new trial in 2000. She had three visits, April 26, May 9 and 24. Each of these visits was described as "going well," the mother was on time for the visits, and she was devoting appropriate attention to the children. The children were not informed that "the lady" visiting them was their mother. After the first visit, the mother requested she be allowed to bring other family members to the visits. This request was denied because it was felt inappropriate and would cause confusion to the children.

The record reveals that the mother's probation for a felony conviction was revoked July 21, 1999, and she was sentenced to one-year confinement. She was given credit for time served from March 14, 1997 to April 7, 1998 (390 days). ... The mother's confinement was not made known to the Tennessee Department of Children's Services. The mother testified that she was "not sure whether the father told the Tennessee Department of Children's Services of her confinement."

In August 1997, the goal of the plan of care was changed to adoption due to the mother's continued noncompliance with the Plans. The mother had been previously informed of the possible consequences of a goal change to adoption. The mother's compliance with the plan of care did not improve even after being informed of the possibility of her parental rights being terminated and of the children becoming candidates for adoption. Both children were placed in the "special needs" category for adoptive placement on December 1, 1997. O. V. has a condition to his heart, requiring medication three times every day. [R. V.] is asthmatic and has episodes of fainting.

The uncontroverted evidence indicates that both children have bonded closely with the prospective adoptive parents, and that a change of caregivers and physical environment would likely have an adverse effect on the emotional and physical condition of the children. The mother testified that she is not able at this time to care for the children almost six years after removal. At this time the mother lives in a group home. The mother admitted she might not have given information to the Tennessee Department of Children's Services that could have assisted them in helping her to overcome some of her deficiencies.

The mother testified that two of her relatives might now be able or willing to have custody of the children. One of the relatives, Latrice Townsend, maternal aunt, testified that she has been with the children only twice during their lifetime. She denied knowing how to seek visitation or custody with the children. She said the Tennessee Department of Children's Services case manager would not assist her to get visitation. She further testified that she was not available to are for the children until after May, 1998. She, along with other family members, along with the father, discussed the possibility of Ann Harris, maternal aunt, seeking custody or adopting the children. Ann Harris made application to be considered as adoptive parent, but she withdrew her application because of personal conflicts she had with the mother. April Townsend, maternal aunt, testified that she is available at this time to care for the children, but she offered no specific plan to achieve this. She has had no involvement with the children up to this point. Neither Ann Townsend nor Latrice Townsend appeared to be realistic candidates for custody or adoption of either or both of the children. They offered no testimony that was positive in support of the mother's ability to care for the children. The most positive testimony was that they, April Townsend and Latrice Townsend, wanted the children.

At the close of proof, mother's attorney that there was or may have been a violation of 42 U.S.C. 12101 and 28 C.F.R.35.130(B)(&), concerning discrimination against mother. There was no evidence offered as proof of any discrimination, and Court finds no discrimination has been proven.

## CONCLUSIONS OF LAW

The Court is of the opinion and finds by clear and convincing evidence that grounds for termination of parental rights of the mother

have been established and that termination of parental rights is in the best interest of the children:

1. That the children have been removed from the home of the mother by order of a court for a period of six (6) months, and
2. That the conditions which led to the children's removal which in all reasonable probability would cause the children to be subjected to further neglect and which prevent the children's safe return to the care of their mother, still persist, and
3. That there is little likelihood that these conditions will be remedied at an early date so that the children could be safely returned to the mother in the near future, and
4. That the continuation of the parent and child relationship with the children greatly diminishes the children's chances of early integration into a safe, stable and permanent home.
5. That the mother is incompetent to adequately provide for the further care and supervision of the children because of the mother's mental condition [and] is presently impaired and is likely to remain so that it is unlikely that the mother will be able to assume the care and responsibility for the child[ren] in the near future.

The mother has a continued inability to provide the necessary fundamental care for said children, even if not willful, the failure constitutes a condition, which prevents the safe return of the children to her care. The efforts to provide help to improve her parenting skills have been unsuccessful, and there is little likelihood of improvement as would allow the safe return of the children to the mother in the near future...

Ms. Valle appeals, raising four issues for our review as stated in her brief:

I. Did the trial court improperly interpret the Tennessee Supreme Court's opinion in *Ferrell v. Cigna*, 33 S.W.3d 731 (Tenn. 2000), and Article VI, Section 4 of the Tennessee Constitution in considering whether the Memphis and Shelby County Juvenile Court Judge may proscriptively appoint a referee as special judge in termination of parental rights cases without following the appropriate procedures and without the consent of the parties.

II. Did the trial court violate Cynthia Valle's right to procedural due process, as guaranteed by the Fourteenth Amendment to the United States Constitution and Article 1, Section 8 of the Tennessee Constitution by the use of unfair procedures.

III. Did the sole testimony of one witness rise to the level of clear and convincing evidence sufficient to terminate the parental rights of a natural parent, when that witness was purportedly the custodian of record who had no personal knowledge of the facts about which she testified.

IV. Did the Tennessee Department of Children's Services make reasonable efforts to help the natural parents meet the requirements of the permanency plans before seeking to terminate their parental rights.

Since this case was tried by the trial court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. *See* Tenn. R. App. P. 13(d).

**Did the Trial Court improperly interpret the Tennessee Supreme Court's opinion in <u>Ferrell v. Cigna</u>, 33 S.W.3d 731 (Tenn. 2000), and Article VI, Section 4 of the Tennessee Constitution in considering whether the Memphis and Shelby County Juvenile Court Judge may proscriptively appoint a referee as special judge in termination of parental rights cases without following the appropriate procedures and without the consent of the parties.**

At the outset of the second trial, counsel for Ms. Valle made the following statement to the Court:

> It's clear that Judge Turner is not here, and it was announced that he found it necessary to be absent, and that you're [George E. Blancett] sitting as Special Judge.
>
> And we [counsel for Ms. Valle] assume that you're sitting by virtue of Tennessee Code Annotated Section 17-2-118 or perhaps 17-2-122 or any of the other statutes that provide for the appointment of a special or substitute judge.
>
> However, we believe that upon information and belief that the proper procedure has not been followed as set out by the Tennessee Supreme Court Rule 11, and also is reiterated in the case of Ferrell vs. Cigna Insurance Company...

-10-

[Here counsel reads, from Rule 11, Tennessee Supreme Court, the proper procedure for appointing substitute or special judges]

To our [counsel for Ms. Valle] knowledge and information this [compliance with Rule 11] has not happened, and therefore we would respectfully ask this court not to proceed today until those procedures have been accomplished.

Although Ms. Valle's counsel raises the issue of noncompliance with statutory procedures, she puts nothing into the record as to exactly how Judge Blancett's appointment has violated Rule 11, Tennessee Supreme Court, or **Ferrell v. Cigna Ins. Co.**, 33 S.W.3d 731. Only a vague reference to Ms. Valle's counsel's own "knowledge and information" is cited. Without specific information, this Court is called upon to guess the source of Judge Blancett's appointment. And this is a task we must decline. Since this record is devoid of any material evidence that might give us compass as to whether proper procedures have been bypassed, we must decline to address the question.

As to the issue of whether appointment of a juvenile court referee as special judge contravenes our State Constitution, our Supreme Court has recently provided a definitive answer on this question in **In re Valentine,** 79 S.W.3d 539 (Tenn. 2002). In **Valentine**, the Court held that "the appointment of a juvenile court referee as a special judge under Tenn. Code. Ann. § 17-2-118(f)(2) does not contravene the provision in Article VI, § 4 of the Tennessee Constitution requiring that a judge be elected." **Id.** at 545.

For the foregoing reasons, this issue is without merit.

### Did the trial court violate Cynthia Valle's right to procedural due process, as guaranteed by the Fourteenth Amendment to the United States Constitution and Article 1, Section 8 of the Tennessee Constitution by the use of unfair procedures.

Appellant points to several incidents at trial, alleging that any one of them could have violated her right to due process under the Fourteenth Amendment. First, Ms. Valle contends that Judge Blancett erred in allowing Ms. Brunt to testify "from her summary of DCS' records, replete with hearsay contained therein." Ms. Brunt's reading from this document drew the following objection from Ms. Valle's counsel:

MS. DAVIS: Your Honor, I'm going to object. I'm not sure, but I'm wondering if the witness is reading, if she has some material she's reading from, and if she does I would like to see it to be apprised [sic] as to what–

THE COURT: The question is, have you reviewed some notes to–

THE WITNESS [Ms. Brunt]: What I've done is–I have to, because you see the depth of the file, I had to summarize and put something together or I wouldn't–it would be easier for me to testify.

MS. DAVIS: Well, I think, Your Honor, if she is testifying from notes, then I'm entitled to see what it is she's testifying from. I see that the records are sitting there, but I also saw her referring in her testimony from the very beginning to some papers that she was reviewing, so I think I'm entitled to see what those papers are.

THE COURT: I don't understand your objection. Are you objecting to her testifying from her notes?

MS. DAVIS: *I'm objecting to her testifying from her notes, yes, without me having reviewed those notes*, Your Honor.

THE COURT: Well, that will be overruled, but if you can, get down to a point subsequent to this that heeds you in your cross-examination of her, and you can renew your ability to see them at that time.

We first note that Ms. Davis objected to this testimony not on the basis of hearsay, but on the ground that she [Ms. Davis] had not had the opportunity to review the document. We note, however, that at least two hearsay objections were warranted by Ms. Brunt's testimony. First, there was the hearsay objection to the DCS records themselves. However, even if this objection was overruled under the business records or other hearsay exception, every statement recorded in a business record is not necessarily admissible as evidence. *See Butler v. Ballard,* 696 S.W.2d 533, 536-37 (Tenn. Ct. App. 1985). Consequently Ms. Valle could still have made a hearsay objection to Ms. Brunt's testimony concerning the contents of the DCS records. However, the record before us does not indicate even one objection to Ms. Brunt's testimony on the grounds of hearsay. Failure to interpose proper and seasonable objections to hearsay equals a waiver and statements or records that would likely be excluded under a proper hearsay objection become sufficient evidence absent such objection. A party who invites or waives error, or who fails to take reasonable steps to cure an error, is not entitled to relief on appeal. *See* Tenn. R. App. P. 36(a), cmt. a. Failure to object to evidence in a timely and specific fashion precludes taking issue on appeal with the admission of evidence. *See Ehrlich v. Weber*, 88 S.W. 188, 189 (Tenn. 1905); *See also Pyle v. Morrison*, 716 S.W.2d 930, 936 (Tenn. Ct. App. 1986); Tenn. R. Evid. 103 (a)(1).

As to the objection that is in record (i.e. Ms. Davis not being allowed to review the document that Ms. Brunt used during her testimony), we find that Judge Blancett subsequently sustained the objection by allowing Ms. Davis to look at the document:

THE COURT: What I would suggest now, would you [Ms. Davis] like to renew your request to examine some of the notes that are nonconfidential in basis?

MS. DAVIS: Yes, Your Honor, I would like to examine–

THE COURT: I think what I might do is recess this hearing until one o'clock and give you the opportunity to meet, and you [Ms. Neale, counsel for CASA] can help with that to be sure that nothing is prevented by the statutory or confidential nature–

MS. NEALE: Are you suggesting that she be allowed to go through case notes?

THE COURT: Anything that she's [Ms. Brunt] testified to involving this child in the matter, that should be made part and available for her [Ms. Davis] to look at...

We note that Ms. Davis' objection was only to her not being allowed to look at the document Ms. Brunt was using. Nowhere in the record do we find an objection based upon improper use of the document to refresh Ms. Brunt's memory nor do we find any objection, whether before or after Ms. Davis was allowed to see this document, on the ground of hearsay. Ms. Davis' objection to not being allowed to see the document was subsequently sustained when Judge Blancett took a recess and allowed Ms. Davis access to whatever Ms. Brunt was using during her testimony. After being allowed to see the document, we do not find any indication in the record that Ms. Davis raised any further objections.

The remaining grounds Ms. Valle raises in support of her argument that she was denied due process stem from the actions of Judge Blancett during the trial. Ms. Valle contends that the manner in which Judge Blancett conducted the trial made it impossible for her to proceed with meaningful cross-examination and, consequently, she was unable to completely develop her case. Ms. Valle alleges, *inter alia*, that Judge Blancett "repeatedly interrupted Mrs. Valle's defense," "impose[d] unrealistic time restraints," "exhibited a cavalier attitude toward establishing the truth,"[14] "sarcastically interjected,"[15] and "rush[ed] to judgment."

---

[14] Ms. Valle cites the following example from the record:

THE COURT: So consequently, the Department of Children Services referred Ms. Valle to the mental health which she didn't go to or did go to.

MS. DAVIS: Well, I don't know that that is true, Your Honor.

THE COURT: Well,--

(continued...)

-13-

We have read the entire trial transcript in this case, and, while we note that some of Judge Blancett's comments, when read from the record, do seem a bit brusque, not every comment by a judge that can be deemed improper requires reversal. During the course of a trial, a judge must be patient, dignified, and courteous to lawyers and witnesses while, at the same time, ensuring that the matter is adjudicated promptly and efficiently.[16] The manner in which a judge chooses to balances these requirements is largely left to the judge's own discretion. When reviewing a

---

[14](...continued)

MS. DAVIS: Maybe the witness–

THE COURT: –the fact that whether or not they knew she was on notice because they referred her to it, so I think that's a given that they thought that she had an involvement there so she was referred to it, but she didn't go. That's the question, as to whether or not she went.

[15] Ms. Valle cites the following example from the record:

THE COURT: Ms. Davis, I'm telling you again that it says here when this case started a couple of days ago it seems that part of the responsibilities of the mother was [sic] to comply with the mental health plan of recommendation, and so she was referred to it and whether she went or not is what's the matter.

\*                                    \*                                    \*

MS. DAVIS: Your Honor, with all due respect, I don't think the testimony has been that she has been referred anywhere by the Department.

THE COURT: I'm just saying that she said she should comply with it. She doesn't–she didn't sign any release, don't have any information, so why spend any more time looking for something that's not there?

MS. DAVIS: Well, the question, Your Honor, is whether or not a release was provided for her to sign. If the testimony is that she refused to sign a release, then the question I have is, do you have the release to demonstrate or to evidence that one was–

THE COURT: It is not signed.

MS. DAVIS: Correct.

THE COURT: That seems nonproductive to find that unsigned release in there, because– [to the witness] quit looking for the release. We will say that there's no unsigned release shown to the satisfaction of the Court. The Court will have to evaluate that.

[16] *See* Rule 10, Supreme Court Rules. Canon 3 (B)(4) states that "[a] judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity...." This duty, however, is balanced against the duty imposed by Canon 3 (B)(8), which is to "dispose of all judicial matters promptly, efficiently, and fairly."

-14-

record for allegations of error, the standard this Court must follow is found in Tenn. R. App. P. 36(b):

> A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.

Considering the whole record, we find no evidence to suggest that Ms. Valle was prejudiced by any comments Judge Blancett made. Therefore, we hold that the manner in which Judge Blancett conducted this trial does not rise to the level of reversible error.

**Did the sole testimony of one witness rise to the level of clear and convincing evidence sufficient to terminate the parental rights of a natural parent, when that witness was purportedly the custodian of record who had no personal knowledge of the facts about which she testified.**

T.C.A. § 36-1-113(c) reads as follows:

> (c) Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination or parental or guardianship rights have been established; and
>
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

In determining whether this clear and convincing standard has been met, we do not look to the testimony of one witness but rather to the record as a whole. So, the correct statement of the issue is not whether the testimony of Ms. Brunt rose to the level of clear and convincing evidence but whether the record, when taken as a whole, shows by clear and convincing evidence that Ms. Valle's parental rights should be terminated based on any of the grounds enumerated in T.C.A. § 36-1-113(g). The question of whether Ms. Brunt's testimony and use of notes was proper is addressed under Issue Two, *supra*.

Turning to the question of whether evidence in this case rose to the level of clear and convincing proof, we first note that Judge Blancett's Order Terminating Parental Rights listed several grounds for termination:

(b) That Respondent has abandoned the children under current law as defined in TCA § 36-1-113(g)(1)(Supp. 2000).

(c) That Respondent has substantially failed to comply with the statement of responsibilities in the ratified Permanency Plan as defined in TCA § 37-2-403.

(d) That said children have been removed from the custody of Respondent by order of the Court for at least six (6) months and the conditions which led to the removal or other conditions which in all reasonable probability would cause said children to be subjected to further abuse or neglect and which, therefore, prevent said children's return to Respondent's care, still persists and there is little likelihood that the conditions will be remedied at an early date so that said children can be returned to Respondent in the near future. Further, the continuation of a relationship with Respondent greatly diminishes said children's chances of early integration into a stable and permanent home.

(e) That in accordance with T.C.A. § 36-1-113(g)(8A)(B)((i)(ii)), the Respondent is incompetent to adequately provide for the further care and supervision of the children because her mental condition is presently so impaired and is likely to remain so that it is unlikely that she will be able to assume the care and responsibility for the children in the near future...

We further note that clear and convincing evidence of any one of the above grounds is sufficient to terminate Ms. Valle's parental rights. *See* T.C.A. § 36-1-113(g). Notwithstanding Ms. Brunt's testimony on behalf of DCS, we find clear and convincing evidence from Ms. Valle's own testimony that she is "incompetent to adequately provide for the further care and supervision of the children because her mental condition is presently...impaired":

Q: Do you [Ms. Valle] feel like you could take care of the kids today? If we let the kids go home with you today are you ready to take care of them?

A: If I had some help.

Q: Okay. But you've got to take care of the kids yourself. They're your kids. Are you ready? Are you in a position to do that?

A: I don't know.

Q: Okay. Do you have a nice place to live where you would be comfortable taking them?

-16-

A: I live in a group home.

Q: Okay. Do you think you would be able to provide for them, you know, with the money that you get to take care of them?

A: I'm sure I'll be needing some more money than what I'm getting.[17]

Q: And, you know, I know you've heard that [O. V.] has some medical problems,--

A: Yes, I heard about that.

Q: –and he needs to get his medicine three times a day and be taken to the hospital occasionally. Do you think you would be able to do that?

A: Not today I wouldn't, because I just–I would need some help. Do you know what I'm saying?

\*                              \*                              \*

Q: ...Do you have any idea of how long it's going to take you to get healthy and able to really take care of your kids all by yourself? Do you have any idea?

A: Not today I'm not. After a little while I should know.

We hold that Ms. Valle's own testimony, along with the entire record, provides clear and convincing evidence sufficient to terminate her parental rights under T.C.A. § 36-1-113(g)(8)(B)(i).[18] Moreover, there is clear and convincing evidence supporting the juvenile court's findings of fact set out above. The record adequately establishes that termination of parental rights is in the children's best interests. Under T.C.A. § 36-1-113(g), this ground alone is sufficient to terminate Ms. Valle's parental rights we, therefore, pretermit discussion of whether clear and convincing evidence exists for the other grounds listed in Judge Blancett's Order.

---

[17] Ms. Valle testified that she receives approximately $457.00 per month in SSI benefits.

[18] T.C.A. § 36-1-113(g)(8)(B)(i) provides that the court may terminate parental rights if clear and convincing evidence exists that: "The parent of guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future..."

Ms. Valle further argues that, under T.C.A. § 36-1-113(g)(8)(A), she was entitled to a bifurcated trial on the issue of her incompetence. T.C.A. § 36-1-113(g)(8)(A) states:

> The chancery and circuit courts shall have jurisdiction in an **adoption** proceeding, and the chancery, circuit, and juvenile courts shall have jurisdiction in a separate, independent proceeding conducted prior to an **adoption** proceeding to determine if the parent or guardian is mentally incompetent to provide for the further care and supervision of the child, and to terminate that parent's or guardian's rights to the child.

*Id.* (emphasis added)

By it's plain language, T.C.A. § 36-1-113(g)(8)(A) requires a proceeding separate from the adoption proceeding to determine competency of the parents. That proceeding is precisely what we are dealing with in this appeal. The matter before us is a termination of parental rights hearing.

### Did the Tennessee Department of Children's Services make reasonable efforts to help the natural parents meet the requirements of the permanency plans before seeking to terminate their parental rights.

Under T.C.A. § 37-1-166(a), the court is required to determine whether DCS made "reasonable efforts" for reunification of the family. T.C.A. § 37-1-166(g)(1) defines "reasonable efforts" as follows:

> As used in this section, "reasonable efforts" means the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family. In determining reasonable efforts to be made with respect to the child, as described in this subdivision, and in making such reasonable efforts, the child's health and safety shall be the paramount concern.

The record in this case contains clear and convincing evidence that DCS has made reasonable efforts to help Ms. Valle keep her family together. Reunification of a family is a two-way street, and the law does not require DCS to carry the entire burden of this goal. By her own testimony, Ms. Valle understood the plans that were put into place after her children were placed into protective custody and that those plans imposed certain requirements on her:

> Q: ...The Department has indicated that certain plans were put in place after your children were taken into custody; do you understand that?

-18-

A [by Ms. Valle]: yes, Ma'am.

Q: Do you understand that they have indicated that certain requirements that they made in order to return your children have not been met by you; do you also understand that?

A: Yes, ma'am.

Additionally, DCS referred Ms. Valle to at least one Parenting Class, which by her own admission she was unable to complete. DCS has allowed visitation with the children, except on those occasions when the children were ill or hospitalized. Within the confines of it's own resources and the specific circumstances of this case, it is the opinion of this Court that DCS has made reasonable efforts to help Ms. Valle meet the requirements of the Permanency Plans. Unfortunately, Ms. Valle, by virtue of her mental illness, incarceration, poverty, or any number of other factors, has been unable to reciprocate in the process of reunification.

For the foregoing reasons, we affirm the order of the trial court. Costs are accessed against the Appellant, Cynthia Valle, and her surety.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.