**Kimberly Michelle PYLE, A Minor, by Her Father and Next Friend, Walter H. PYLE, Jr., and Walter H. Pyle, Jr., Individually, Plaintiffs/Appellees,**

v.

**Larry B. MORRISON, M.D., William L. Bourland, M.D., and Philip M. Aronoff, M.D., Defendants/Appellants.**

Court of Appeals of Tennessee,
Western Section, at Jackson.

May 29, 1986.

Permission to Appeal Denied by
Supreme Court Sept. 2, 1986.

Robert L. Green and Kaye C. Thurmond, Neely, Green, Fargarson & Brooke, Memphis, for plaintiffs/appellees.

Albert C. Harvey and Michael G. McLaren, Thomason, Hendrix, Harvey, Johnson, Mitchell, Blanchard & Adams, Memphis, for defendants/appellants.

HIGHERS, Judge.

This is a medical malpractice action brought by a minor and her father, both as her next friend and individually. The jury returned a verdict in favor of the plaintiffs in the amounts of $400,000 for the minor and $15,000 for the father.

On Sunday, June 22, 1980, Kimberly Michelle Pyle fell at a friend's backyard swimming pool fracturing both bones, the ulna and the radius, in the lower left arm. She was taken to the emergency room of Baptist Hospital East by her mother where she was seen by Dr. Larry Morrison, one of the defendants in this case. The father joined them at the emergency room. A small puncture wound on the lower arm was noted by both Dr. Morrison and the child's parents. Testimony at trial concerning the appearance of the wound was conflicting. The father testified the wound was "real dirty with grass on it." Dr. Morrison testified that there was "no gross dirt, grass or anything of that nature anywhere near the area of the puncture itself." After x-rays were taken, Dr. Morrison cleaned the wound with betadine antiseptic solution, fixed the fracture and applied a plaster cast. He also prescribed an antibiotic. He asked the parents if they would be able to observe Kimberly frequently day and night for signs of swelling and problems in moving her fingers. The alternative, he advised, was hospitalization. The parents took her home with instructions from Dr. Morrison to give aspirin for pain and to elevate the arm and apply ice. The emergency room personnel gave the parents an instruction sheet that advised them to watch for symptoms of swelling, fever and odor or drainage from the cast. Dr. Morrison also advised the parents to bring Kimberly into his office the next day to be seen by his partner, Dr. Aronoff, another defendant in this case.

The parents followed the instructions at home. Dr. Aronoff did see the patient the next day, Monday, June 23, 1980. He noted only minimal swelling in her left hand and advised the mother to bring Kimberly back in three to four days. On Wednesday, June 25, 1980, the mother called Dr. Bourland, another partner in this medical group and another defendant in this case. She indicated that Kimberly was having severe pain in her arm and fingers. Upon Dr. Bourland's advice, she brought Kimberly into the office where Dr. Bourland split the cast because of swelling in the fingers and forearm. This procedure relieved the pain, and Dr. Bourland advised the patient to return the next day. Kimberly and her mother returned on Thursday, June 26, 1980. After x-rays were taken, Dr. Aronoff reapplied a cast and advised that they return in three to four days. Early the next day, Friday, June 27, 1980, Kimberly's father noted an odor about the cast. He took the child in to see Dr. Bourland about 2:00 p.m. The patient had a foul odor about her arm, swelling of the hand, and pain on attempted passive range of motion of the fingers. The cast was removed, and the patient had a discoloration of the forearm and a thin brown drainage from the puncture wound. She was taken to the hospital for exploratory surgery which revealed a significant amount of muscle loss and a myonecrotic process taking place. Cultures and stains done on the drainage at that time later revealed a gangrenous process from a clostridium infection. The wound was debrided and dead muscle tissue removed. Intravenous antibiotics were started. On Sunday, June 29, 1980, after another exploratory surgery, the doctors advised the parents that the infection had become life threatening and that her arm would have to be amputated. That afternoon, a below the elbow amputation of the gangrenous left forearm took place. The doctors continued to treat the patient until her discharge on July 10, 1980, and the removal of her sutures on July 20, 1980.

At trial, medical proof focused on (1) whether the initial treatment which did not involve extensive irrigating and cleaning of the wound was appropriate treatment, and (2) whether the defendants were negligent in failing to recognize the infection process in time to save the arm.

After trial, the jury returned a verdict for the plaintiffs. On appeal, the defendants present four challenges to the court's actions at trial: (1) Whether the trial court erred in admitting testimony of a nurse to the effect that she told the plaintiffs' lawyer that it was her impression that a portion of the medical record was altered after the surgery; (2) whether the trial court erred in allowing an orthopedic doctor from Maryland to testify as to the standard of care in Tennessee when the plaintiff had also had a doctor from a contiguous state (Mississippi) to testify; (3) whether the trial court erred in disallowing cross examination of the plaintiffs' expert from Mississippi concerning the ten lawsuits filed against him (none of which went to trial); and (4) whether the trial court erred in not admitting into evidence the finding of the Medical Malpractice Review Board.

At trial, plaintiffs had two expert witnesses to testify that the defendants deviated from the acceptable standard of professional practice within the community. One witness was from Mississippi and the other from Maryland. The defendants challenge as an error of law the court's ruling allowing an expert witness from a noncontiguous state to testify for the plaintiffs when the plaintiffs also had an expert witness from a contiguous state. The defendants had six experts prepared to testify. Three of these were the defendants in this case; one was a doctor called in for consultation on the case; and the other two were expert witnesses, one from Tennessee and one from a contiguous state. The plaintiffs submitted an affidavit from their counsel that stated in pertinent part:

Your Affiant has made diligent search and inquiry by contact with physician friends and attorneys who specialize in the trial of medical liability cases and he has not found a physician from Tennessee or its adjacent states who will testify in this case except Dr. Skagerberg [the Mississippi physician].

It is the considered judgment of your Affiant that the Plaintiffs' lawsuit would be materially affected by a ruling which would take from the case one of two expert witnesses especially when the Defendants have identified six.

The court allowed the testimony of the expert witness from Maryland, stating:

It just seems to me that in fairness that if they give the Court the discretion to allow the testimony of any expert witness when they can't find a single doctor either in Tennessee or a state contiguous—As I said before, which includes almost the whole Southeast. They can't find a single physician in that area—We started off in this case not finding one, and apparently found one in Florida and Maryland, and then to say since we did find one in the last moment down in Mississippi that that prohibits the use of the one which has been known the defendants for several years—or a year at least. I think it just would be unjust.

I'm not trying to even up the stack. I wouldn't allow five witnesses for the plaintiff.

I think in equity and justice the Court, having discretion, will find that based on that Affidavit he was not able to find witnesses that he felt were necessary and, therefore, the Court will allow one witness outside the immediate vicinity of the State of Tennessee and one from either Tennessee or adjacent states.

T.C.A. § 29-26-115(b) states:

(b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a) unless he was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make his expert testimony relevant to the issues in the case and had practiced

this profession or specialty in one of these states during the year preceding the date that the alleged injury or wrongful act occurred. This rule shall apply to expert witnesses testifying for the defendant as rebuttal witnesses. The court may waive this subsection when it determines that the appropriate witnesses otherwise would not be available.

Although cases decided prior to the enactment of T.C.A. § 29–26–115(b) indicated that the locality rule had been somewhat eroded, *McCay v. Mitchell,* 62 Tenn.App. 424, 463 S.W.2d 710 (1970), this statute reaffirmed that the locality rule was still the measure for the competency of a witness in a malpractice case. The statute, however, still leaves some discretion with the trial court to waive the locality rule but only after the court determines "that the appropriate witnesses otherwise would not be available." The question presented to this Court is upon what condition may a court waive the "locality rule"? Did the trial court properly determine "that the appropriate witnesses otherwise would not be available"?

In *Ayers v. Rutherford Hospital, Inc.,* 689 S.W.2d 155 (Tenn.App.1984), the Court upheld the trial court's grant of a summary judgment for the defendants. The trial court had refused to allow the testimony of a doctor who did not practice medicine in Tennessee or a contiguous state. The Court of Appeals first stated:

> We are of the opinion after a review of this record that the Trial Court correctly found that Dr. Abramson was not competent to testify "as to the local standard of practice or as to Dr. Smith's failure to conform to such standard in that Dr. Abramson did not practice medicine in Tennessee or a contiguous bordering state during the year preceding the date of the alleged injury...." We are further of the opinion that the record fully supports his finding that the plaintiffs made no showing that Tenn.Code Ann. § 29–26–115(b) should be waived since there is nothing in the record to show

that an "appropriate witness otherwise would not be available."

689 S.W.2d at 161. The Court further stated:

> We are also of the opinion that the Trial Court did not abuse its discretion in determining that Dr. Abramson was not qualified to testify as an expert regarding the local standard of care required of physicians practicing obstetrics in Murfreesboro.

> . . . . .

> The trial judge has broad discretion in dealing with the qualifications and admissions of testimony of expert witnesses. *See,* e.g., *Shelby County v. Barden,* 527 S.W.2d 124 (Tenn.1975); *Cordell v. Ward School Bus Manufacturing, Inc.,* 597 S.W.2d 323 (Tenn.App.1980).

689 S.W.2d at 162.

In the present case, the plaintiffs did make a showing that T.C.A. § 26–26–115(b) should be waived. Their counsel submitted an affidavit to the effect that after diligent search and inquiry, he was able to find only one witness within a contiguous state. The trial court considered proof from both sides and made a decision to allow the testimony of the non-contiguous witness. We cannot say that in so doing he has abused the discretion allowed him by the statute. The statute contemplates that there may be more than one appropriate witness when it uses the plural, "witnesses." Although we cannot say that the statute allows the trial court to mechanically "even up the stack" of witnesses, we do think that the statute places some discretion with the trial court to allow or disallow testimony in the interest of equity and justice. Further, we cannot say that the trial court abused its discretion in finding that the witness was qualified to testify as to the standard of care in Tennessee.

The second issue presented to this Court is whether the trial court erred in disallowing cross examination of the plaintiffs' expert witness concerning medical malpractice lawsuits filed against him. Outside the presence of the jury, it was developed

that plaintiffs' expert witness from Mississippi had been the object of ten suits for malpractice, some of which were settled, some dismissed or dropped. None, however, had been reduced to judgment. The court in disallowing this cross-examination stated:

We have a man here who was charged or has been sued for malpractice. We don't know—We could never find out from everybody—There would be no way in the world to ever get enough evidence in this room, to fill up this room, to find out exactly what the circumstances were about those alleged malpractices.

The fact that his insurance company, he says, paid off here, there and yon for this, that and the other, I don't see what in the world that has to do with his ability to tell us—his only testimony is, as I see it, as an expert would be to tell us what is the standard of care for doctors in performing this activity. What is the standard of care.

Even if he didn't carry it out, he may well know it. Then, if you want to get into anything—You have already mentioned that you want to talk about his lack of ability to practice medicine down there. If you can show that he's been denied medical privileges, if there is some reason for that because of incompetency or drunkenness or whatever that he's not—he doesn't know what he's doing or what he's talking about, that's something else, but the mere fact that a person has been sued for malpractice, just as these defendants right here who are now being sued for malpractice, doesn't in my opinion have any—doesn't impune [sic] their ability or their conduct or anything else at least until the jury has found that they are guilty of it.

As I see this, we don't have a single case in which it went to the jury and the jury found that he was guilty of anything. The fact the insurance company settled—We don't know the law even in the states where they settled, whether he had to consent to it or not or what the situation was.

In *State v. Morgan,* 541 S.W.2d 385 (Tenn.1976), the Tennessee Supreme Court adopted Federal Rule of Evidence 608(b) as the standard to be used to determine the admissibility for impeachment purposes of specific instances of conduct not resulting in criminal convictions. That rule states, in pertinent part:

(b) *Specific instances of conduct.* Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

The *Morgan* court held that acts admissible to impeach under 608(b) did not include "indictments, charges and accusations that some particular offense has been committed." 541 S.W.2d at 389. In *Brooks v. State,* 187 Tenn. 67, 213 S.W.2d 7 (1948), the court gave the following reason for excluding indictments, quoting *People v. Morrison,* 195 N.Y. 116, 88 N.E. 21, 22 (N.Y.App.1909):

An indictment is a mere accusation, and raises no presumption of guilt. It is purely hearsay, for it is the conclusion or opinion of a body of men based on ex parte evidence.

213 S.W.2d at 11.

The same reasoning could be applied to charges of malpractice that did not result in a judgment. They are merely hearsay. In any event, Rule 608(b) puts the decision within the trial court's discretion. The *Morgan* court stated:

We further hold that where a witness is sought to be cross-examined as to specific instances of conduct as contemplated by Rule 608(b), the Court shall conduct a jury-out hearing for the pur-

pose of determining that the probative value of such evidence outweighs its prejudicial effect. When such cross-examination is permitted the answer of the witness shall be conclusive.

541 S.W.2d at 390.

■ The trial judge in the present case conducted a jury-out hearing and decided to exclude the evidence. His reasons for exclusion are sound, and therefore, we hold that the trial judge in the present case did not abuse his discretion in limiting the scope of cross-examination of the expert witness as to unproven malpractice claims against him.

The third issue is whether the trial court erred in admitting the testimony of a nurse to the effect that she told the plaintiffs' lawyer that it was her impression that a portion of the medical record was altered after the surgery on the minor plaintiff. Toward the end of the trial, Sandy Long was called as a witness by the defense. She was a former employee of the defendant doctors. On cross-examination, the following exchange took place between Ms. Long and plaintiffs' counsel:

Q. I came out to your home last Monday evening, didn't I?

A. Yes, you did.

Q. And I asked you a lot of questions about this lawsuit—

The defense counsel interjected with the following comment:

Excuse me, Your Honor, I don't know the purpose of this, but I don't know that it's relevant.

At that point, a bench conference was held during which the court determined Ms. Long's testimony to be relevant. There were no further objections that day to the testimony.

The plaintiffs' counsel then elicited the following responses during his continued cross-examination:

Q. Ms. Long, after I had already closed up my record and had started to walk out of your kitchen, do you remember that you asked me, "Can I look at that record one more time?"

A. Yes.

Q. And when you looked at that record didn't you put your fingers there and tell me that you don't think that record—that paragraph in that record was on there when you typed Dr. Bourland's note?

A. Yes, I did.

Q. And didn't you tell me, Ms. Long, that your recollection was that that paragraph was added after this young lady had had her arm amputated?

A. What I told you was that I was not certain that was there before. It was my impression that it was added after the amputation.

Q. And didn't you tell me, Ms. Long, that the reason was because Ms. Gwin Ford came up and showed it to you?

A. Yes, I did.

On re-direct examination, the defendants' counsel and Ms. Long had the following exchange:

Q. Now, what is it that makes you indicate that you think this one paragraph was done later?

A. Well, as I told Mr. Green, that I just always had that impression. I told him that I could be wrong, but that was my impression from his secretary, Gwin Ford.

But, I did not type it. I did not see it typed and I certainly didn't retype any of the record. So, you know, I told him that I could be wrong, that I would not swear to it that it was not there originally.

Q. Well, then you say it is your impression, is that the most you know about this?

A. Yes, it is.

Q. Did Ms. Ford tell you this?

A. No, she didn't say it in direct words, no.

Q. So, the most that you have is this impression?

A. Yes.

Q. You don't know anything positively one way or the other about this record, do you?

A. Not that paragraph, no. I'm positive about things that I typed.

After further examination, the defendants, expressing surprise over this development in the trial, asked for further time to find Ms. Ford. The following day, defense counsel requested a mistrial "on the basis that the evidence presented by Ms. Long yesterday through Mr. Green's cross examination was so inappropriate and so prejudicial that not only should it be striken from the record, but it is so important to this case that it is grounds for a mistrial ..." This motion was denied. To rebut Ms. Long's testimony, defense counsel then called Ms. Ford who denied altering any records. Dr. Morrison was also recalled. He also denied any alterations.

■■■ The only objection to this testimony would have been on the basis of hearsay. The defendants failed to object at trial on that basis and therefore have waived their appeal on that point. The Tennessee Supreme Court has stated, "Incompetency not objected to is waived." *Middle Tennessee R. Co. v. McMillan,* 134 Tenn. 490, 184 S.W. 20, 24 (1916). Neither do we think that the testimony was so inflammatory or prejudicial as to warrant a mistrial. The testimony was rebutted the next day by the defendants. The trial court did not err in denying a mistrial.

The fourth issue is whether the court erred in not admitting into evidence the findings of the medical malpractice review board. Outside the presence of the jurors, counsel for the defendants offered into evidence the findings of the Medical Malpractice Review Board dated June 10, 1982. The trial court declined to admit the evidence stating:

"Allright. Well, the Court, as previously stated, will not admit such letter. First, because I find that that portion of the statutes of the State of Tennessee has been held by almost every Court I think, in this Circuit as unconstitutional; and also because that is no longer in effect and in order to be introduced as evidence, that law would have to be currently in effect. Of course, as you know, because of the Sunset Law, it was extinguished some time ago and is not even a law today, and for those two reasons will not admit it."

T.C.A. § 29–26–112(d)(2) states:

(2) The formal statement of the board and the minority statement, if any, shall be admissible at a subsequent trial as an exception to the hearsay rule.

This section was repealed by Acts 1985 Ch. 184 § 4, in which the legislature took note that the Medical Malpractice Review Board had "ceased all activities and its existence on June 30, 1983, pursuant to the provisions of T.C.A., § 4–29–112."

■■■ The general rule is that constitutional issues should not be addressed by a court unless necessary for the determination of the issues presented. *Watts v. Memphis Transit Management Co.,* 224 Tenn. 721, 462 S.W.2d 495 (1971). The constitutionality of this statute need not be reached in this case because it does not apply to the present case. The statute was not in effect at the time of trial. The statute has been held to involve procedural rather than substantive rights. *Stokes v. Leung,* 651 S.W.2d 704 (Tenn.App.1982). Although the repeal of a statute cannot operate to impair or otherwise affect vested rights that accrued while the statute was in force, *Hutton v. State,* 175 Tenn. 44, 131 S.W.2d 11 (1939), the repeal of a statute remedial in character has the effect of taking away that remedy even for proceedings pending under it at the time of appeal. *See* 82 C.J.S. *Statutes* § 439, p. 1013. The court in *Hutton* held that the repealed statute in question in that case applied to a case that came to trial after the repeal only after first deciding that the statute was not remedial in nature. Therefore, because T.C.A. § 29–26–112(d)(2) involves only a procedural remedy and was repealed before this case came to trial, we hold that the statute is not applicable in this case. The trial judge did not err in refusing to admit the findings of the Medical Malpractice Review Board.

The last issue raised by the defendants is whether the trial court erred in failing to charge part of the language in Tennessee Pattern Jury Instruction. That instruction states:

> You must determine the standard of professional learning, skill and care required of the defendant only from the opinions of the physicians and surgeons [including the defendant] who have testified as expert witnesses about that standard.
>
> Consider each opinion, the qualifications of the witness and the reasons given for his opinion. Then given each opinion the weight you believe it should have.
>
> You must resolve any conflict in the testimony of the witnesses by weighing each of the opinions expressed against the others, taking into consideration the reasons given for the opinion, the facts relied upon by the witness, his relative capability, and his special knowledge, skill, experience, training and education.

The trial judge charged only the first paragraph and omitted the bracketed language "including the defendant". The defendants object to the language, "including the defendant," being omitted. The trial court, in deciding not to include that phrase, stated:

> Now, I already will have charged that when they assess the testimony of these experts because they're giving opinions unlike ordinary witnesses, that they can give each of these witnesses whatever weight and credit they want. That's their job. That's based on their ability to determine whether Dr. so and so deserves any credit for his testimony or not.
>
> But once they give them credit, they must eventually find some doctor in the group that they believe. And that that doctor must be the one that gives them the standard of care required. That's the law. I think that is the law.

■ The refusal of a requested instruction is not reversible error if that instruction is included in other instructions that are given to the jury. *Duling v. Burnett,*

22 Tenn.App. 522, 124 S.W.2d 294 (1938); *Westmoreland v. Memphis Transit Co.,* 305 F.2d 71 (6th Cir.1962). The trial court gave the following charge before giving the charge that the defendants contest:

> Now, in this case, evidence was introduced which is called expert evidence, that is, opinion evidence as distinct from other evidence. Expert evidence is simply the opinion of a man or woman supposed to be learned in a scientific matter which the ordinary layman knows little or nothing of. The ordinary witness testifies to facts that he or she has seen, that they have heard, or that they know, and ordinarily the opinion of a witness is not competent evidence. But the law makes an exception when dealing with technical or scientific subjects, and permits men or women who are supposed to be learned in that particular field to come in and given their opinion with a view to aiding laymen in reaching a correct solution of the question under consideration. So you ladies and gentlemen of the jury will bear in mind that distinction when you come to weighing the expert evidence, and carefully scrutinize that evidence and give it such weight as you think it's entitled.

■ We hold that the instruction that the defendant wanted but did not get was covered by the instructions that were given by the court. Expert witnesses were identified as those "learned in that particular field." This includes the defendant doctors. There was, therefore, no error made by the trial court in refusing the requested instruction.

The judgment of the trial court is affirmed. Costs are adjudged against the appellants.

TOMLIN, J., and KIRBY MATHERNE, Special Judge, concur.