IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 23, 2011 Session

## MICHAEL H. GAW, ET AL. v. THE VANDERBILT UNIVERSITY, ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 05C-3671      Hamilton V. Gayden, Judge**

_____

**No. M2011-00306-COA-R3-CV - Filed April 19, 2012**

_____

This is an appeal from a jury verdict in a medical malpractice case. A surgeon performed a procedure on an infant to repair a birth defect at the defendant hospital. The infant sustained permanent injuries after the surgery. The parents filed suit on the infant's behalf against the hospital for failing to adhere to the expected standard of care. At the conclusion of trial, the hospital moved for a directed verdict on all claims, with only the claims for informed consent and post-operative negligence being denied. The jury entered a judgment in favor of the infant. The hospital has appealed. We affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

Steven E. Anderson and Sara F. Reynolds, Nashville, Tennessee, for the appellants, The Vanderbilt University d/b/a Vanderbilt University Medical Center d/b/a Vanderbilt Children's Hospital.

Todd A. Rose, Paris, Tennessee, and Les Jones, Memphis, Tennessee, for the appellees, Michael H. Gaw, a Minor, By Next Friends and Parents, Howard Gaw and Beth Gaw.

**OPINION**

**I. BACKGROUND**

On December 3, 2002, Michael H. Gaw, the plaintiff, was born with a condition known as bladder exstrophy. Bladder exstrophy is a rare birth defect that causes an infant

to be born with the bladder open and on the outside of the body with neither the abdominal wall nor pelvic bones fused together. In a male infant, the penis is foreshortened and split in half.

Due to the complexity of the condition, Gaw was transferred within hours after his birth to Vanderbilt University Children's Hospital (defendant entities collectively "Vanderbilt"). The next day, Gaw was cared for by John C. Pope IV, M.D., a pediatric urologist at Vanderbilt. Dr. Pope determined that the infant had a penile length sufficient to attempt to perform a "primary repair" of the bladder and penis.

In the United States, there are two recognized surgical methods for the repair of bladder exstrophy in male infants. The first, which is called "the modern staged repair," involves the closure of the bladder shortly after birth, with the repair of the penis occurring approximately six months later. This method separates the repair of the bladder and the repair of the penis into two separate surgeries. The second method, the "complete repair," involves the repair of the bladder as well as the penis in the same surgery. During this procedure, the bladder is closed, the pubic bones are brought together, and the urethra is put in place to drain urine as far toward the tip of the penis as its length will allow. Then, the penis is repaired in a process called "degloving" the penis. Essential, the penis is divided and disassembled, then reconstructed by bringing the halves of the penis together, complete with stitches all around the penis and under the glans. The complete repair is also known as the Mitchell repair, named after Michael Mitchell, M.D., and has become widely adopted for bladder exstrophy procedures.

After examining Gaw and determining he had an adequate bladder plate and penile length of closure, Dr. Pope performed a complete repair on Gaw on December 5, 2002. At the end of the surgery, Gaw was taken to the recovery room, where he was attended by Dr. Pope and his urology team. During this time, several nurses and at least two physicians recorded observations regarding the color and condition of Gaw's penis. In the days after surgery, Gaw's penis looked bruised and "congested" and was described as "purple," "black," and "necrotic." Despite these observations, Dr. Pope insisted that there was no basis for surgical intervention in the days following the surgery. At trial, he testified that after a complete repair surgery, the penis is not typically pink:

> Q.     Now, is the penis after this reconstruction typically pink and healthy looking?
>
> A.     No.
>
> Q.     Is -- Doctor, is that -- is that even possible given what you have done

in the operating room?

A.     Well, I mean, we -- just demonstrated the complexity of taking the penis apart and putting the penis back together again.  And any time there's that degree of dissection and work and reconstruction of the penis, it's going to look like it's been -- it's not going to be just pink and fresh and happy and beautiful looking immediately after surgery.

Gaw's parents, Beth and Howard Gaw ("Parents"), were concerned about their son and asked Dr. Pope about the condition of the infant's penis.  According to their testimony, Dr. Pope responded that the discoloration and "crusty" appearance of the penis was due to a scab that would eventually fall off.  He did not tell Parents that Gaw had sustained an injury to his penis at that time.  When Gaw was discharged on December 28, 2002, he had lost a portion of the left corporal body (or shaft) of the penis and most of the left side of the glans (or head) of the penis.

Following Gaw's discharge from Vanderbilt, Parents transferred his care to Dr. John Gearhart, M.D., the Chief of the Department of Pediatric Urology at The Johns Hopkins School of Medicine at The Johns Hopkins Medical Center in Maryland.  In his experience as a surgeon, he had performed over two hundred bladder exstrophy closures and had "reclosed" approximately one hundred twenty bladder exstrophy patients.  When Dr. Gearhart first saw Gaw in 2003, he noted that part of Gaw's penis was missing and explained this to Parents.  Parents claim that Dr. Gearhart was the first physician to tell them that Gaw had sustained an injury to his penis.

On December 2, 2005, Parents filed suit on Gaw's behalf against The Vanderbilt University and Dr. Pope.  Pursuant to Rule 26 of the Tennessee Rules of Civil Procedure, Gaw designated an expert from Nashville, Tennessee, Victor Braren, M.D.  But prior to trial, Gaw sought and obtained a waiver of the contiguous state requirement contained in Tennessee Code Annotated section 29-26-115(b) to also allow the expert testimony of Dr. Gearhart, who, as stated above, practices in Maryland.

In September 2010, the jury trial was commenced.  Dr. Pope was voluntarily dismissed as a defendant during the trial.  Dr. Gearhart asserted that Gaw's injury was attributable to Dr. Pope's post-operative negligence.  Although he had never performed a complete repair, which was the surgery performed on Gaw, Dr. Gearhart testified that following this type of surgery, Gaw's penis should have been "pink," not "purple" or "black."  Dr. Gearhart asserted that when Dr. Pope brought Gaw's pubic bones together with sutures, he was "stitched too tightly," which put pressure on the erectile bodies.  Dr. Gearhart explained that Dr. Pope's failure to return Gaw to surgery and let the pressure off the erectile

bodies caused the harm that otherwise would not have occurred:

> Q.     Do you have an opinion, Dr, Gearhart, as to whether or not it would have made a difference if Dr. Pope had complied with the standard of care and gone back in and taken Michael Gaw to surgery?  Do you have an opinion as to whether it would have made a difference with respect to the loss of the penile tissue?
>
> A.     I think, early on, when they were talking about it being bluish and then light purple and things like that in the nursing notes, I think had they taken Michael back to the operating room, removed the suture from the pubic bones, observed the penis in the operating room under anesthesia and then taken corrective measures, I think more likely than not he would not have lost as much of his penis as he did.

But, Dr. Gearhart was not able to articulate exactly how much of Gaw's penis would have been saved if Dr. Pope had taken him back into surgery:

> Q.     And you can't tell this jury how much would have been spared if surgery had been -- if some sort of surgical procedure had been instituted on the 6th or the 7th or the 8th of December, can you?
>
> A.     Well, I can say more likely than not he wouldn't have lost as much tissue as he had.  And the earlier they would have done it on the 6th, 7th, the earlier, the better.  I think he would have lost less tissue.
>
> Q.     Right.  And "less" is an undefined term here?
>
> A.     Well, when your penis is 50 percent shorter than normal, every little bit is important.
>
> Q.     And I'm not quibbling with you over that, Doctor.  The question is: You can't tell this jury with any kind of precision what amount would have been spared, can you?
>
> A.     No.  But I think he would not have lost as much as he did.

Vanderbilt made an oral motion for directed verdict on all claims at the close of Gaw's proof, and the court granted the motion in part, dismissing the claim for negligent supervision

of the surgical procedure at issue and denying the motion as to the claims of informed consent and post-operative negligence. The jury returned a verdict for Vanderbilt with respect to the informed consent issue but found that Dr. Pope had departed from the recognized standard of acceptable professional practice in the post-operative care and medical treatment of Gaw. Finding for Gaw on the issue of causation, the jury awarded $1,300,000 in damages.

The court entered a judgment in accordance with the jury's verdict. Vanderbilt filed a motion for judgment in accordance with motion for directed verdict, motion for new trial, or, in the alternative, for remittitur in November 2010. The court denied Vanderbilt's post-trial motion in its entirety. Vanderbilt timely filed its notice of appeal on February 7, 2010.

## II. ISSUES

Vanderbilt raises the following five issues on appeal:

(1)     Whether the trial court erred in granting a waiver from the geographic restriction of Tennessee Code Annotated section 29-26-115(b) for expert witness Dr. Gearhart.

(2)     Whether the trial court erred in denying Vanderbilt's motion for directed verdict on the grounds that Gaw's causation proof was insufficient as a matter of law.

(3)     Whether the trial court erred in allowing the testimony of Dr. Gearhart on the issue of causation, pursuant to Rule 703 of the Tennessee Rules of Evidence.

(4)     Whether the trial court erred in denying Vanderbilt's motion for a remittitur of the jury's $1,300,000 verdict.

(5)     Whether the trial court erred by precluding Vanderbilt from presenting demonstrative photographs of a male child before and after bladder exstrophy surgery to refute the testimony of Dr. Gearhart.

# III. STANDARD OF REVIEW

In considering a motion for a directed verdict, the trial court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 390 (Tenn. 2006) (quoting *Crain v. Benton*, 823 S.W.2d 187, 195 (Tenn. Ct. App. 1991)); *Johnson v. Tennessee Farmers Mut. Ins. Co.*, 205 S.W.3d 365, 370 (Tenn. 2006). Directed verdicts are appropriate when the evidence supports only one conclusion. *Gann v. International Harvester Co.*, 712 S.W.2d 100, 105 (Tenn.1986); *see Gaston v. Tenn. Farmers Mut. Ins. Co.*, 120 S.W.3d 815, 819 (Tenn. 2003). They are inappropriate when the material facts are in dispute or when there is substantial disagreement concerning the conclusions to be drawn from the evidence. *Long v. Mattingly*, 797 S.W.2d 889, 892 (Tenn. Ct. App. 1990).

Once a trial court has approved a jury verdict, the standard to be applied on appeal to review the jury verdict is stringent. *Shropshire v. Roach*, No. M2007-02593-COA-R3-CV, 2009 WL 230236, at *3 (Tenn. Ct. App. Jan. 30, 2009). The applicable standard of review is set out in Rule 13(d) of the Tennessee Rules of Appellate Procedure, which provides, "[f]indings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." Appellate courts should not reweigh evidence or decide where the preponderance of the evidence lies. *Whaley v. Perkins*, 197 S.W.3d 665, 671 (Tenn. 2006). If the record contains "any material evidence to support the verdict, [the jury's findings] must be affirmed. *Crabtree Masonry Co. v. C & R Constr., Inc.*, 575 S.W.2d 4, 5 (Tenn. 1978).

# IV. DISCUSSION

## A. Contiguous State Requirement

Tennessee Code Annotated section 29-26-115(b) provides:

No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred. This rule shall apply to expert witnesses testifying for the defendant

as rebuttal witnesses. The court may waive this subsection (b) when it determines that the appropriate witnesses otherwise would not be available.

Tenn. Code Ann. § 29-26-115 (b) (Supp. 2011). The Tennessee Medical Malpractice Act requires all experts to have been licensed and practicing in Tennessee or a contiguous state in the year preceding the events alleged in the action. Tenn. Code Ann. § 29-26-115(b). But the trial court may waive the contiguous state requirement when it determines "that the appropriate witnesses otherwise would not be available." *Id*.

Trial courts have broad discretion in determining the competency of experts. *Pyle v. Morrison*, 716 S.W.2d 930, 933 (Tenn. Ct. App. 1986) (quoting *Ayers v. Rutherford Hosp., Inc.*, 689 S.W.2d 155, 162 (Tenn. Ct. App. 1984)); *Rose v. HCA Health Servs.*, 947 S.W.2d 144, 147 (Tenn. Ct. App. 1996) *perm. app. denied* (Tenn. 1997). Appellate courts will not reverse the ruling of a trial judge on the issue of competency of a witness unless it is shown that the trial judge was clearly in error, and the decision was an abuse of discretion. *Id*. The abuse of discretion standard of review is a less rigorous review of the lower court's decision. *Lee Med., Inc. v. Beecher*, 312 S.W. 3d 515, 524 (Tenn. 2010); *Beard v. Bd. of Prof'l Responsibility*, 288 S.W.3d 838, 860 (Tenn. 2009). It does not permit reviewing courts to second-guess the court below, *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999), or to substitute their discretion in place of the lower court's, *Henry v. Goins*, 104 S.W.3d 475, 479 (Tenn. 2003), because the decision being reviewed involved a choice among several acceptable alternatives. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 708 (Tenn. Ct. App. 2000).

Vanderbilt asserts on appeal that the trial court erred when it waived the contiguous state requirement to allow the testimony of the additional expert witness Dr. Gearhart. Vanderbilt cites *Ward v. Glover* , 206 S.W.3d 17, 37-38 (Tenn. Ct. App. 2006), where the plaintiff's counsel sought waiver of the contiguous state requirement in order to introduce the testimony of a New York physician, although the plaintiff already had two experts who met the requirement. The crux of the plaintiff's argument was that the out-of-state doctor was more qualified as an expert witness. We upheld the trial court's denial of the waiver based on the holding of a Tennessee federal district court case, *Ralph v. Nagy*, 749 F. Supp. 169, 174 (M.D. Tenn. 1990), that held when a plaintiff has "appropriate" expert witnesses, the locality rule will not be waived to allow the plaintiff to "ice his cake" with the testimony of an expert who is allegedly more qualified. *See Ward*, 206 S.W.3d at 37. Vanderbilt contends that allowing Gaw to bring in a "world-renowned" expert would, in essence, allow Gaw to "ice his cake" with the testimony of a more qualified witness.

In response, Gaw argues that, given the trial court's wide discretion in allowing testifying experts, Dr. Gearhart's testimony was properly admitted pursuant to *Pyle v.*

*Morrison*, 716 S.W.2d 930 (Tenn. Ct. App. 1986). In *Pyle*, the trial court waived the locality rule to admit the testimony of an expert witness from Maryland when the plaintiff already had one expert witness from a bordering state. *Id*. at 932. The plaintiff's counsel submitted an affidavit to the effect that after diligent search and inquiry, he was able to find only one witness within a contiguous state. *Id*. In upholding the waiver, the court noted that the "statute contemplates that there may be more than one appropriate witness when it uses the plural, 'witnesses.'" Furthermore, the statute "places some discretion with the trial court to allow or disallow testimony in the interest of equity and justice." *Id*. at 933.

Even though the court in *Ward* found it inappropriate to waive the locality rule under the facts of that case, this does not mean that the trial court's decision in this case constitutes an abuse of discretion. Pursuant to *Pyle*, the court can waive the requirement when a plaintiff shows that, after diligent search and inquiry, the plaintiff can only find one expert witness from a bordering state. *Pyle*, 716 S.W.2d at 932. Even though Gaw's counsel retained Dr. Braren, who fell within the requirement, they submitted an affidavit evidencing a good-faith, reasonable search for an appropriate expert witness.[1] The trial court's decision to waive the requirement was within the "range of acceptable alternatives," and, as stated in *Ward*, we will not "second-guess a trial court's exercise of its discretion simply because the trial court chose an alternative" that this court would not have chosen. *See Ward*, 206 S.W.2d at 38; *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999). Therefore, we find that the trial court's decision in this case to waive the contiguous state requirement was not an abuse of discretion.

## B. Causation for Negligent Post-Operative Care

In order to succeed in a malpractice action, a plaintiff must prove that "[a]s a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred." Tenn. Code Ann. § 29-26-115 (a)(3); *see also Payne v. Caldwell*, 769 S.W.2d 142, 143 (Tenn. 1990), *Taylor v. Jackson-Madison County Gen. Hosp.*, 231 S.W.3d 361, 365 (Tenn. Ct. App. 2006). The trial court denied Vanderbilt's motion for directed verdict on the issue of whether Dr. Pope's negligent post-operative care of Gaw was the legal cause of Gaw's injuries. Under the directed verdict standard, Vanderbilt must show that there is no material evidence contrary to the proposition that Gaw

---

[1] Gaw's search for an expert witness within a contiguous state began in 2005 and included: reviewing legal publications, reviewing direct mailings from organizations that serve as liaisons between attorneys and expert witnesses, consultation with other attorneys, reviewing opinions from state and federal medical malpractice cases, sending letters to 14 medical schools in Tennessee and seven surrounding states, and communicating directly with five pediatric urologists.

would have sustained the same loss if Dr. Pope had returned Gaw to surgery.

Causation must be proved by a preponderance of the evidence, whereby the plaintiff must demonstrate that the negligence *more than likely* caused the injury. *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598-99 (Tenn. 1993), *Lindsey v. Miami Dev. Corp.*, 689 S.W.2d 856, 861 (Tenn. 1985) ("[p]laintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result."). The mere occurrence of an injury does not prove negligence. *See Kilpatrick*, 868 S.W.2d at 599. Moreover, even when a defendant has breached a duty of care owed to the plaintiff, the plaintiff must still establish that the defendant's conduct caused the plaintiff's injury. *Id*.

Vanderbilt argues that Dr. Gearhart's testimony on causation evidences a "loss of chance" case, and because Tennessee does not recognize loss of chance claims, the directed verdict should have been granted. *See Kilpatrick*, 868 S.W.2d at 602. The loss of chance doctrine permits recovery where the delay in proper treatment of a medical condition causes a patient to be deprived of a less than even chance of recovering. *Id*. at 599. But "[c]ausation in fact is a matter of probability, not possibility, and in a medical malpractice case, such must be shown to a reasonable degree of medical certainty." *Id*. at 602 (citing *White v. Methodist Hosp. South*, 844 S.W.2d 642, 648-49 (Tenn. Ct. App. 1992)). Because showing the possibility of causation is not sufficient to establish the nexus between a plaintiff's injuries and a defendant's conduct, the Court in *Kilpatrick* stated that "the loss of chance theory of recovery is fundamentally at odds with the requisite degree of medical certitude necessary to establish a causal link" in a medical malpractice case. *Kilpatrick*, 868 S.W.2d at 602. Therefore, in Tennessee, a plaintiff must prove that the physician's act or omission more likely than not was the cause in fact of the harm. *Id*. at 599.

Accordingly we must determine whether Dr. Gearhart's testimony in fact established a reasonable basis for the conclusion that it was more likely than not the conduct of Dr. Pope that was a cause in fact of Gaw's injury. If Dr. Gearhart's testimony, instead, establishes a loss of chance case, whereby Dr. Pope's actions deprived Gaw of a less than even chance of recovering, Vanderbilt should have been entitled to judgment as a matter of law in accordance with its motion for directed verdict.

At trial, Dr. Gearhart testified that if Gaw would have been returned to surgery, he "more likely than not . . . would not have lost as much of his penis as he did." This conclusion was supported by the opinion that Gaw's pubic bone sutures were the cause of the loss of blood to the penis, not the surgical repair of the penis itself. As foundation for his opinion, Dr. Gearhart offered an anecdote, whereby one of his patients was prevented from losing any penile tissue following a surgical repair of the bladder when he was returned to

surgery shortly after his penis became discolored.

Vanderbilt claims this anecdote is irrelevant because it involved a surgical repair of the bladder only, with no penile repair. In this case, Gaw underwent a procedure to repair both the bladder and penis in one operation, not merely a repair of the bladder. But Dr. Gearhart's conclusion rested on the belief that the loss of blood to the penis resulted from Gaw being closed too tightly during the surgical repair of the bladder, not the repair of the penis. Dr. Gearhart testified that Dr. Pope should have taken Gaw back into surgery to remove sutures from the pubic bone, which were put in during the bladder repair. Because the complication was a result of the bladder repair, and not the penile repair, Dr. Gearhart's anecdote regarding a patient that was returned to surgery after a bladder repair was relevant. Therefore, this anecdote goes toward the resolution of the issue of whether Dr. Gearhart's testimony consisted of material evidence that refutes the proposition that Gaw would have sustained the full extent of his loss even if Dr. Pope had returned Gaw to surgery.

Vanderbilt also asserts that Dr. Gearhart's testimony is directly contrary to his incantation of "more likely than not" language. Vanderbilt claims that there is no factual or scientific basis for his "more likely than not" conclusion. Dr Gearhart conceded that he was unaware of "any data, any scientific basis for the opinion that the infant would have suffered less tissue loss" if he had been taken back to surgery on December 6, 2002. Moreover, while Dr. Gearhart testified that Gaw "would not have lost as much of his penis as he did," he could not articulate what the precise amount of tissue loss would have been if there was post-operative intervention:

> "We might have ended up in the same boat that we're in today, but we don't know that. And I think that he had *a chance of possibly saving some soft tissue*, saving part of that penis had they done something earlier, before it turned black 48 hours after surgery."

(Emphasis added). Vanderbilt claims that this testimony on causation with respect to the alleged post-operative negligence evidences a loss of chance theory. His failure to articulate how much tissue the infant allegedly lost from Dr. Pope's negligence and the lack of scientific evidence supporting his conclusion creates, according to Vanderbilt, an insufficient basis for the conclusion that it was more likely than not the conduct of Dr. Pope that caused the result.

As recognized in *White v. Vanderbilt University*, 21 S.W.3d 215 (Tenn. Ct. App. 1999) *perm. app. denied* (Tenn. 2000), "[t]he law does not require the level of specificity and certainty" that Vanderbilt advocates. *Id.* at 232. Instead, Gaw need only produce evidence showing that Dr. Pope's negligence, more likely than not, caused Gaw's injuries. *See id.* The evidence presented by Dr. Gearhart is sufficient to create a jury-submissible issue of fact

and overcome the standard for a directed verdict. As shown from his anecdote, he encountered a similar complication and, because of his decision to take his patient back into surgery, no penile tissue was lost. And, as stated by Dr. Gearhart on cross-examination, his opinion testimony stems from his extensive experience with bladder exstrophy complications and "25 years of experience on how [he] would treat [this]." Although Dr. Gearhart could not precisely articulate how much tissue the infant lost due to Dr. Pope's negligence, Dr. Gearhart testified that Gaw would have experienced less tissue loss if Dr. Pope had returned him to surgery, particularly if he had been returned to surgery soon after the penis began to show signs of oxygen deprivation.

A similar type of causation testimony was shown to be sufficient to survive a directed verdict in *White*, whereby an expert testified that "it's more likely than not that the sooner that the blood clot was removed, the better off the patient would end up." *White*, 21 S.W.3d at 232. Dr. Gearhart's testimony, while lacking complete certainty on the exact loss sustained due to Dr. Pope's negligence, is sufficient to overcome a directed verdict on the issue of causation.

We do not find that Dr. Gearhart's testimony set forth a loss of chance theory whereby the alleged acts of Dr. Pope "might have" or "possibly" resulted in Gaw's injuries. Construing the testimony of Dr. Gearhart in a light most favorable to Gaw, we cannot say that the only conclusion that a reasonable person can draw is that Dr. Pope was not negligent and that his conduct did not cause Gaw to suffer damages that he would not otherwise had suffered. Therefore, the denial of the directed verdict is affirmed.

## C. Admission of Dr. Gearhart's Causation Testimony

Questions regarding the admissibility of testimony are left to the discretion of the trial court. *See McDaniel v. CSX Transp.*, 955 S.W.2d 257, 263 (Tenn. 1997). But a trial court's ruling on the admissibility of evidence may be overturned on appeal where the discretion is arbitrarily exercised. *Id*. at 263-64. A trial court abuses its discretion if it applies an incorrect legal standard or reaches an illogical or unreasonable decision that causes an injustice to the complaining party. *State v. Stevens*, 78 S.W.3d 817, 832 (Tenn. 2002).

In Tennessee, Tennessee Rules of Evidence 702 and 703 govern the issue of admissibility of scientific proof. These rules determine how the trial court should decide what expert testimony a jury will hear. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will substantially assist
> the trier of fact to understand the evidence or to determine a fact in issue, a

witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Tenn. R. Evid. 702.  Rule 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.  Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.  The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703.  Based on these two rules, the trial court must determine that the expert testimony is reliable in that the evidence will substantially assist the trier of fact to determine a fact in issue and that the underlying facts and data appear to be trustworthy.  Pursuant to Rule 703, Vanderbilt moved *in limine* to exclude the causation testimony of Dr. Gearhart regarding the post-operative care claim, but the trial court denied Vanderbilt's motion. Vanderbilt argues that Dr. Gearhart's opinions are "baseless speculation" and not based on relevant scientific methods, process, and data, in violation of Rule 703.

First, Vanderbilt asserts that the trial court admitted Dr. Gearhart's testimony based on the length of his resume, not on the scientific reasoning and methodology underlying his testimony.  Vanderbilt provided the trial court's order as proof of this error:

> In denying this motion, the Court finds that Dr. Gearhart's extensive experience in treating patients with bladder exstrophy as well as his extensive academic endeavors and publications on the topic of bladder exstrophy qualify him to render his opinions in this matter . . . .

Because the trial court did not base its holding on whether "the reasoning or methodology underlying the testimony [wa]s scientifically valid," Vanderbilt argues that Rule 703 was violated and the court abused its discretion by admitting Dr. Gearhart's causation testimony.

Second, Vanderbilt asserts that Dr. Gearhart had no data and no scientific basis to support his opinion on causation.  During his discovery deposition, Dr. Gearhart testified as follows:

Q.      Doctor, do you have any data, any scientific basis for the opinion that the child would have suffered less tissue loss if he had been operated or reoperated on when this nurse made that note?

A.      No.

When asked whether he was attempting to change that deposition testimony during trial, Dr. Gearhart said, "No.  I think – again, I think that – I don't have any scientific basis for it, but I have 25 years of experience and [have] seen a lot of exstrophy children, and I think that not doing anything for this child resulted in more tissue loss."  Vanderbilt argues that because Dr. Gearhart's experience and academic credentials cannot act as substitutes for scientific methods, processes, and data, his causation testimony was baseless speculation.

In determining the reliability of scientific testimony, the Tennessee Supreme Court in *McDaniel* listed several nonexclusive factors that courts could consider, including:

> (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether . . . the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

955 S.W.2d at 265.

A trial court has great latitude in assessing the reliability of the expert testimony and is not required to rigidly apply the *McDaniel* factors. *Brown v. Crown Equipment Corp.*, 181 S.W.3d 268, 277 (Tenn. 2005).  The reasonableness of the *McDaniel* factors in assessing reliability depends on the particular issue, the witness's expertise, and the subject of the expert's testimony. *Id*.  The *McDaniel* factors may apply when they are reasonable measures of the reliability of the expert testimony. *State v. Stevens*, 78 S.W.3d 817, 834 (Tenn. 2002).

The Tennessee Supreme Court has also stated that a trial court may consider other factors in assessing the reliability of the expert's testimony.  First, the trial court may consider the expert's qualifications for testifying on the issue. *Stevens*, 78 S.W.3d at 834-35; *see Brown*, 181 S.W.3d at 274.  This factor is applicable particularly where the expert's personal experience is essential to the methodology or analysis underlying the opinion. *Brown*, 181 S.W.3d at 274.  Second, the trial court may consider the straightforward connection between the expert's knowledge and the basis for the opinion such that no "analytical gap" exists between the data and the opinion offered. *Stevens*, 78 S.W.3d at 835.

-13-

While these factors are helpful to the trial court in determining the reliability of the testimony, a trial court need not consider all these factors in making its determination. *Brown*, 181 S.W.3d at 274. These nonexclusive factors aid the court in its gatekeeping function, but upon admission, the expert testimony will be subject to vigorous cross-examination and countervailing proof. *Stevens*, 78 S.W.3d at 835; *McDaniel*, 955 S.W.2d 265. The trier of fact is entrusted with the responsibility of weighing the importance of expert opinions.

In this case, Vanderbilt has not shown that Dr. Gearhart's opinion lacked trustworthiness under Rule 703 of the Tennessee Rules of Evidence. His opinion was based on his practical experiences, his extensive experience in treating patients with bladder exstrophy, and his academic endeavors and publications on the topic of bladder of exstrophy. As the Tennessee Supreme Court has stated, an expert's opinions are reliable "if the expert's conclusions are sufficiently straightforward and supported by a 'rational explanation which reasonable [persons] could accept as more correct than not correct.'" *Brown*, 181 S.W.3d at 275 (quoting *Wood v. Stihl*, 705 F.2d 1101, 1107-08 (9th Cir. 1983)). Dr. Gearhart testified that the pressure on Gaw's pubic bones diminished the blood supply to his penis, which caused Gaw to sustain an injury that he otherwise would not have sustained. He reached this conclusion based on his extensive experience treating bladder exstrophy and on a specific instance where taking a patient back to surgery prevented the loss of any penile tissue. His testimony was subject to vigorous cross-examination by Vanderbilt, and the jury was given the opportunity to weigh the countervailing proof.

Upon reviewing the record, we conclude that Dr. Gearhart's scientific testimony was sufficiently reliable. Therefore, we hold that the trial court did not abuse its discretion in admitting Dr. Gearhart's testimony and finding that the testimony was not so unreliable that is should be precluded under Rule 703.

### D. Court's Approval of Jury's Verdict

Although the calculation of damages is primarily for the jury, the trial court has the statutory prerogative to adjust damage awards to accomplish justice between the parties and to avoid the time and expense of a new trial. Tenn. Code Ann. §§ 20-10-101, 102; *Long v. Mattingly*, 797 S.W.2d 889, 896 (Tenn. Ct. App. 1990). Pursuant to this power, the trial court, acting as the thirteenth juror, may grant remittitur "when the trial judge is of the opinion that the verdict in favor of a party should be reduced." *Bates v. Jackson*, 639 S.W.2d 925, 926 (Tenn. 1980); *Benson v. Tennessee Valley Elec. Co-op.*, 868 S.W.2d 630, 639 (Tenn. Ct. App. 1993).

But where a trial judge has approved a jury award and denied a defendant's motion for remittitur, the reviewing court should afford deference to those who heard the evidence. *See Thrailkill v. Patterson*, 879 S.W.2d 836, 841 (Tenn. 1994). When the defendant seeks remittitur on appeal, appellate review is subject to the rule that if there is any material evidence to support the award, it should not be disturbed. *Pettus v. Hurst*, 882 S.W.2d 783, 788 (Tenn. Ct. App. 1993) (citing Tenn. R. App. P. 13(d)). Therefore, we must limit our factual review to determining whether the record contains material evidence that supports an award of $1,300,000. *Poole v. Kroger Co.*, 604 S.W.2d 52, 54 (Tenn. 1980); *Pettus v. Hurst*, 882 S.W.2d 783, 788 (Tenn. Ct. App. 1993).

In the instant case, the jury awarded Gaw, who was only a few days old at the time of injury, $500,000 in past and future pain and suffering and $800,000 for permanent impairment and disfigurement. Given the permanent nature of the injury sustained by Gaw and the fact that he sustained this injury so early in life, we find that the record contains material evidence in support of the jury verdict.

Vanderbilt argues that due to the weakness of Gaw's causation proof, the jury's verdict should be subject to remittitur and substantially reduced. Because we have held that Dr. Gearhart's testimony consisted of material evidence that refutes the proposition that Gaw would have sustained the full extent of his loss even if Dr. Pope had returned Gaw to surgery, we are not persuaded by this argument. Therefore, we hold that the motion for remittitur was properly denied.


### E. Exclusion of Vanderbilt's Intro-Operative and Post-Operative Photographs

The final issue brought before this court is whether the trial court erred in prohibiting Vanderbilt from presenting to the jury several intra-operative and post-operative photographs of a male child undergoing a complete repair procedure. The admissibility of photographs lies within the discretion of the trial court and reviewing courts will not disturb these decisions on appeal unless the trial court has abused its discretion. *State v. Banks*, 271 S.W.3d 90, 115 (Tenn. 2008). Reviewing courts will find an abuse of discretion only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party. *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008).

One of the issues at trial was the appearance of the penis following a complete repair, particularly whether the penis would be pink in color or turn purple or blue. Vanderbilt was precluded from showing five photographs that depicted the steps a pediatric urologist takes

in reconstructing the bladder, which included degloving the penis, reconstructing it, and a picture of what the penis looked like after such a surgery. Vanderbilt claims Dr. Gearhart's testimony regarding what a penis should look like after being "degloved" went unchecked because Vanderbilt was precluded from showing photographs that depicted the steps of the procedure. According to Vanderbilt, because the jury did not get to see what it really looked like to take apart a penis intra-operatively, the jury's verdict was adversely affected.

We do not agree. The trial court allowed Vanderbilt to show twenty-five color diagrams that depicted various stages of a bladder exstrophy patient and the repair process. These diagrams gave the jury an accurate understanding of what the surgery consisted of without exposing them to, arguably, less helpful real-life photographs of someone other than the patient in this case. Out of the seven photographs Vanderbilt sought to introduce, the court allowed Vanderbilt to show two surgical photographs. This demonstrates that the court did in fact exercise its discretion to let in certain photographs while excluding others. Vanderbilt has not shown that the court applied incorrect legal standards, erroneously assessed the evidence, or caused injustice to Vanderbilt. Vanderbilt was allowed to try its case within the bounds of what the court thought was appropriate. Since abuse of discretion was not proved, we will not disturb the decisions of the trial court on appeal.

## V. CONCLUSION

The judgment of the trial court is affirmed in all respects. The costs on appeal are assessed against the appellants, The Vanderbilt University d/b/a Vanderbilt University Medical Center d/b/a Vanderbilt Children's Hospital.

_____
JOHN W. McCLARTY, JUDGE